Hubert J. KISSEL, Alloys A. Kissel, and Hubert W. Kissel, Co-Partners, d/b/a H. Kissel's Sons, (Plaintiffs) Respondents,

v.

The AETNA CASUALTY AND SURETY COMPANY, (Defendant) Appellant.

No. 31339.

St. Louis Court of Appeals.

Missouri.

June 15, 1964.

Motion for Rehearing or to Transfer to Supreme Court Denied July 21, 1964.

G. W. Marsalek, Joseph H. Mueller, Moser, Marsalek, Carpenter, Cleary & Jaeckel, St. Louis, for appellant.

Kappel & Neill, John C. Kappel, Robert E. Staed, St. Louis, for respondents.

RUDDY, Presiding Judge.

This action was instituted by Hubert J. Kissel, Alloys Kissel and Hubert W. Kissel, co-partners, doing business as H. Kissel's Sons against the Aetna Casualty and Surety Company on a Comprehensive General Liability policy issued by the defendant to the plaintiffs. Plaintiffs are in the general contracting business and are primarily engaged in the erection of schools and churches. Five suits were filed by individual property owners against the plaintiffs herein for damage to their property alleged to have been caused by reason of careless and negligent excavation by the plaintiffs herein and their failure to give a notice of excavation. Each of the suits was for a substantial sum of money. Plaintiffs herein, feeling that the suits were within the coverage of the aforementioned policy, called upon defendant to defend and handle the aforesaid suits. The defendant, shortly after assuming control of said suits, withdrew from the defense of said suits because it claimed the policy did not afford coverage. Plaintiffs were able to compromise all of these claims and in settlement thereof and for litigation expense, court costs and attorneys' fees, expended the sum of $8,443.55. Plaintiffs received judgment for this amount, plus interest thereon in the amount of $2195.25, together with damages for vexatious delay in the amount of $3344.35, aggregating a total judgment of $13,983.15. From this judgment defendant has appealed.

As stated, plaintiffs were primarily engaged in the building of schools and churches. When a building job was procured they would usually estimate the carpentry work and the concrete work in the building and would normally sublet the balance of the work to be done to subcontractors.

On April 30, 1952, plaintiffs signed a contract to build a school for Our Lady of Good Counsel's parish. On this job plaintiffs did the carpentry work and the balance of the work was sublet to subcontractors. The subcontract for the excavation work was let to D. E. Murphy. Plaintiffs commenced the erection of the building about the middle of May, 1952. D. E. Murphy, the excavation subcontractor, in addition to digging the foundations of the building, was to grade the site of the school premises which was about 12 or 13 acres, change the contour of the site and after the foundation of the school building was completed, his job was to backfill and shape up the entire area. The area included an athletic field. All of the excavating work was completed by June of 1953, having been started about the middle of May, 1952.

The first part of October 1952, shortly after the playground excavation was started, a series of cracks developed in the ground at the rear or south of the playground area. Hubert J. Kissel, one of the plaintiffs, testified that "Suddenly the ground opened up." The cracks in the ground referred to developed at the toe of a slope or incline. When these cracks developed Hubert J. Kissel called the architect who, in turn, called an engineer, and the three of them determined to put

into the cracks and openings a large fill of earth to hold the slope. The witness said the object of bringing in the dirt was to stabilize the hill, to keep it from moving further, stating that the crack developed at the toe of the slope when the earth began to move. This witness testified that the dirt fill was done "beginning with November 7th and then November 9th, 10th, 11th, and so on." The plaintiffs completed the work under the contract by November of 1953.

Five suits were filed against plaintiffs by the owners of five separate pieces of property situated generally to the south of and contiguous to the area where the series of cracks developed in the ground at the toe of the slope and incline heretofore described. One of these suits was filed in May 1957 and four in July 1957. After the original petitions had been filed and served upon the plaintiffs herein, the property owners, plaintiffs in said suits, filed amended petitions, each and all of which contained similar allegations. The pertinent parts of these petitions are as follows:

"3. That the defendants are contractors engaged in the business of general contracting, building and excavating work and as such entered into a contract to, and did, excavate property lying generally to the north of and contiguous to plaintiffs' above described property; that such work was started in approximately August, 1952 and continued until a few days prior to November 11, 1952.

"4. That the defendants negligently removed earth from property contiguous to plaintiffs' and thereby withdrew the lateral support of the earth in its natural state of plaintiffs' property, causing it to sink and slide in a northwardly direction.

"5. That said action on the part of defendants violated plaintiffs' rights of lateral support for the earth on plaintiffs' said property.

"6. That defendants gave plaintiffs no notice of their intention to excavate.

\* \* \* \* \* \*

"9. That defendants did such excavation in a negligent and careless manner in that defendants excavated below the water table level and excavated without putting in foundations, piling and footings to prevent the earth on plaintiffs' land from sinking and sliding away."

After the summonses and petitions were served on the plaintiffs, Hubert Kissel, one of the plaintiffs herein, turned all of the papers over to the agent who had written the insurance through the defendant company. The defendant then turned over the defense of these suits to its attorneys, the same attorneys now representing them in this action. Thereafter, plaintiffs cooperated at all times with the attorneys for the defendant. After defendant's attorneys took the deposition of Mr. and Mrs. Greimann, plaintiffs in one of the five pending suits, they wrote to the plaintiffs, in the instant case, under date of August 30, 1957, informing them that the deposition casts some doubt upon the insurance coverage, and informed said plaintiffs that the defendant was willing to have the attorneys continue the active defense of the cases, provided it was understood and agreed that by so doing the Aetna Casualty and Surety Company waived none of its rights under its policy issued to the plaintiffs and that all of its rights thereunder were fully reserved. Plaintiffs were further informed that if they were willing to have defendant's attorneys defend the suits on that basis and with that understanding that each of the plaintiffs insured under the policy may so indicate by signing a copy of a letter enclosed for that purpose and were requested to return the signed copy to the attorneys for their records. All of the plaintiffs accepted this reservation and

signed the letter enclosed for that purpose and returned the letter to the attorneys for the defendant.

Thereafter, further depositions of the claimants against the plaintiffs were taken by defendant's attorneys. Parts of the depositions of these claimants were read into evidence in the instant case. Mr. William Matthews said that the first thing he saw was some of Mr. Greimann's land crack and open up. Mr. Greimann's land adjoined that of the witness Matthews. Matthews then testified "that crack continued in my yard, into my property." He then testified that he first saw the original crack in February of 1957. Upon further questioning he testified that when he moved into his house there had been a crack in the ground and at the time he moved in the crack was filled and, as he put it, "were resodding it." He said this took place in "all the yards involved in it. I don't know how many at that time." He then stated that this took place in May of 1953. Mr. Bosch, another claimant, testified that the first damage to his property was April or May of 1957. When he was asked to fix the date more accurately, he answered, "Well, in this respect, referring to Mr. and Mrs. Greimann, that was the original, and this cracking was a progressive thing. My damage didn't occur at the same time, just kept breaking away." Following the taking of these depositions defendant's attorneys notified the plaintiffs herein on December 6, 1957, that they were withdrawing from the defense of the aforesaid suits "because the Aetna Casualty & Surety Company policy issued to you does not afford coverage to your organization or its members for the losses and damages mentioned in the petition." All of the depositions and photographs taken and the reports of investigations made were made available to the plaintiffs and their attorneys. Before this date defendant's attorneys had filed answers in all of the cases filed against plaintiffs and had filed a motion to consolidate all of the cases for trial. This motion was still pending at the time defendant's attorneys withdrew from the defense of the suits against plaintiffs.

The plaintiffs herein engaged the attorneys who now represent them in this instant action to defend them in the five suits that were pending when defendant's attorneys withdrew from the defense of the five suits. Thereafter, plaintiffs' attorneys made a demand on the defendant herein to resume the defense of the five suits and this demand was refused by defendant.

As heretofore stated, the suits were settled before trial and the amounts paid in settlement, the litigation expense, the court costs and the reasonableness of the plaintiffs' attorneys' fees for the handling of the five suits are not here in dispute. In the course of the hearing of the instant matter it was stipulated that equivalent coverage was purchased by the plaintiffs for the years following the policy in suit and that this coverage was kept in force under the same conditions during the entire subsequent period.

The policy in question is, as heretofore stated, a "Comprehensive General Liability Policy." The business of the insured as shown in the declarations of the policy is that of "Contracting" and the policy period began November 13, 1951, and extended to November 13, 1952. Under the "DECLARATIONS" the only part pertinent to this case is "The Property Damage Liability" which shows insurance to the limit of "$5,000 each accident, $25,000 aggregate operations, $25,000 aggregate contractual, and $25,000 aggregate protective." Under the designation "aggregate products" there is no amount shown. The advance premium for the coverage shown is $37.51. Declaration 4 stated, "The Declarations are completed on attached General Liability Schedule." Declaration 5 states, "The General Liability Schedule discloses all hazards insured hereunder known to exist at the effective date of this Policy, except as herein stated." Nothing is stated following this declaration.

The General Liability Schedule, above referred to, is in tabular form. In five "boxes" and in adjacent vertical columns appear respectively: "(A) PREMISES OPERATIONS," with a description of this in subdivisions including general carpentry, residential carpentry, clerical office employees, and Concrete Construction work, all with extension of premium rates, advanced premiums and rating Code Nos. into the proper adjacent columns. Box (C) shows "INDEPENDENT CONTRACTORS—LET OR SUBLET WORK" with an extension of premium rates and deposits into the proper columns. Box (D) shows "PRODUCTS (INCLUDING COMPLETED OPERATIONS) not covered." The hazards "(B) ELEVATORS" and "(E) CONTRACTUAL" bear the notation "No exposure" and have no bearing on the issues involved in the instant case.

The policy provides that "The Aetna * * * Agrees with the Insured, named in the Declarations made a part hereof, * * * subject to the limits of liability, exclusions, conditions and other terms of this Policy: * * * Coverage B—Property Damage Liability To pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by accident."

The pertinent parts appearing under "CONDITIONS 4 Limits of Liability" are as follows:

"(b) Coverage B.

\* \* \* \* \* \*

"The limit of property damage liability stated in the Declarations as 'aggregate protective' is the total limit of the Company's liability for all damages arising out of injury to or destruction of property, including the loss of use thereof, caused by operations performed for the named Insured by independent contractors or omissions or supervisory acts of the Insured in connection therewith, except maintenance or ordinary alterations and repairs on premises owned or rented by the named Insured.

\* \* \* \* \* \*

"(c) Products. The limits of bodily injury liability and property damage liability stated in the Declarations as 'aggregate products' are respectively the total limits of all the Company's liability for all damages arising out of the products hazard. All such damages arising out of one prepared or acquired lot of goods or products shall be considered as arising out of one accident." (As stated, no coverage for this.)

Under the section denominated "EXCLUSIONS" the policy shows the following pertinent provisions:

"This Policy does not apply: * * * (d) under Coverage B, to injury to or destruction of * * * (3) any goods or products manufactured, sold, handled or distributed or premises alienated by the named Insured, or work completed by or for the named Insured, out of which the accident arises."

Under the section denominated "Conditions" are a number of definitions, among which is the following:

"(c) Products Hazard. The term 'products hazard' means: * * *

"(2) operations, if the accident occurs after such operations have been completed or abandoned at the place of occurrence thereof * * * provided, operations shall not be deemed incomplete because improperly or defectively performed or because further operations may be required pursuant to a service or maintenance agreement."

Two endorsements are attached to the policy. One is entitled "Endorsement-General Liability" with a subheading "Exclusion of Products Hazard." Then the following appears: "It is agreed that the Policy does not apply: 1. to the Products Hazard as defined therein; * * *."

In the trial court the parties consented to waive a jury and the issues were tried by

the court. After the trial was completed the trial judge entered a memorandum opinion in which he made certain findings which we approve and adopt. It was found that during the period the policy was in force certain cracks or openings appeared and developed in property located immediately south of the recreational field that had been excavated and graded by Murphy and that additional dirt was hauled in and used to correct the condition; that sometime thereafter there was a reoccurrence and the condition became progressively worse; that during the year 1957 a series of lawsuits were filed against plaintiffs by the owners of the mentioned property to recover damages which resulted from the aforesaid condition; that the initial shift or slide of land was first detected or noticed while Murphy was still grading and excavating the field adjoining the property in question; that corrective measures then were instituted to arrest the shift or slide of land; that it is evident the said condition was directly related to the grading and excavating which was in progress; that this indicated a basic change in support, rigidity and stability of the ground then and there occurred; that although the lawsuits filed by the property owners claimed damage from conditions which appeared and developed later, and after the work had been completed, such conditions flowed directly from the basic cause and original change in support, rigidity and stability of the ground. The court further found that the damage was directly attributable to the grading and excavating operations conducted by Murphy and that these operations caused or contributed to cause a movement of the ground and instability thereof; that once started such condition became creeping in form and continuous in nature. The court further found that whether the work was completed or not completed, the damage was already there and in motion; that there was nothing to reveal a contrary conclusion.

Defendant in its first point contends that the policy does not cover damages occurring after the insureds' (plaintiffs') operations had been completed. It contends that at the time of the damages shown in evidence the plaintiffs had completed their operations, hence the policy did not cover the alleged damages.

Defendant points out that this form of insurance policy has not previously been before the courts of this state and that a search of the law of the cases in other states discloses that there are two lines of authority with respect to the policy provisions in question. It asks us to adopt the reasoning found in a line of cases it cites in support of its position and contends that the contrary line of authorities relied on by plaintiffs is out of accord with logic and reason, fails to give words their usual and ordinary meaning and fails to accord any meaning at all to substantial provisions of the policy.

It is the position of the defendant that the plaintiffs completed their entire job—excavating, digging, building—everything, and were off the job and received final payment by November of 1953. It contends that after the plaintiffs left the job and received the final payment in November 1953 the job was a "completed operation" within the meaning of the policy in question. Defendant relies upon the following provisions contained in the policy. It points out that Declaration 4 made the General Liability Schedule a part of the declarations upon which the policy was based; that Declaration 5 was a statement that the General Liability Schedule disclosed all hazards insured against, known at the effective date of the policy. It further points out that the General Liability Schedule itself stated that with respect to "PRODUCTS (INCLUDING COMPLETED OPERATIONS)" they were "not covered." It also points out that this was reiterated and emphasized in an endorsement which said "Exclusion of Products Hazard It is agreed that the Policy does not apply; (1) to the Products Hazard as defined therein"; and it points out that the Products Hazard as defined in the policy was stated to mean,

"Operations, if the accident occurs after such operations have been completed or abandoned at the place of occurrence thereof * * *; provided, operations shall not be deemed incomplete because improperly or defectively performed or because further operations may be required pursuant to a service or maintenance agreement."

Defendant cites numerous cases allegedly in support of its position. The support that defendant seems to find in these cases is summed up in its brief in the statement that the cases cited "in support of our position, correctly assume that a 'completed operation' is a 'product,' to be dealt with properly under provisions governing 'Products Hazards,' and in so holding, those courts have given effect to the ordinary usage of the English language, and have given effect to all of the terms of the insurance contract."

We see no need to detail the facts of the cases relied on by defendant because in virtually all of the cases there was a product involved, either manufactured, sold, handled or distributed by the insured. In the case of United States Sanitary Specialties Corp. v. Globe Indemnity Company (U.S.C.A. 7th) 204 F.2d 774, the product was wax. In Standard Accident Insurance Company v. Roberts et al., (U.S.C.A. 8th) 132 F.2d 794, a gas operated refrigerator. In New Amsterdam Casualty Company v. Ellzey (U.S.C.A. 5th) 240 F.2d 618, the product installed was a window fan. In the case of Berger Bros. Electric Motors, Inc., v. New Amsterdam Casualty Co., 293 N.Y. 523, 58 N.E.2d 717, a ventilation fan. In Crook v. Kalamazoo Sales and Service Inc., 82 R.I. 387, 110 A.2d 266, an oil and gas range. In Hutchinson Gas Co. v. Phoenix Indemnity Company, 206 Minn. 257, 288 N. W. 847, a gas stove. In Hardware Mutual Casualty Company v. Schantz (U.S.C.A. 5th) 186 F.2d 868, a hoist. In the following cases cited by defendant it admits that the policy terms differ from those under consideration in this case. The cases are, Baker v. Maryland Casualty Company, (R.I.) 56 A.2d 920; Smith v. United States

Fidelity and Guaranty Company, 142 Neb. 321, 6 N.W.2d 81; Foster Trailer Company v. United States Fidelity & Guaranty Company, 190 Tenn. 181, 228 S.W.2d 107; General Casualty Company of Wisconsin v. Larson (U.S.C.A. 8th) 196 F.2d 170.

Defendant contends that the other line of cases which holds contrary to the position advocated by it does violence to logic and to the ordinary rules by which contracts are construed and that the opinions in those cases "go off" on a tangent by missing the meaning of the word "products." Defendant holds that in those cases the courts erred by equating the word "product" with "goods, wares and merchandise." It contends that this kind of construction misses the ordinary usage and standard definition of the word "product." And in support of its position cites the definition as given in Webster's New International Dictionary Unabridged, 2d Ed. 1951. Defendant contends that "when a contractor walks away from a slope after completing his grading work, the result that he leaves behind him is as much the 'product' of his work as" is the brief filed by defendant in this case, the product of the writer's work. It says that the idea that a contractor has no "product" is wholly illogical, erroneous and fallacious and that the building of the athletic field and the school are the "products" of their builders and that what a contractor leaves behind when his work is finished—his "completed operation"—is his "product."

■ We do not agree with defendant's position in attaching such a broad meaning to the term products as used in the insurance policy in question. We do not think it was the intended policy meaning when using the term products and this appears more convincingly so when the policy itself states the nature of the insured's business as "contracting." Support for our disagreement with defendant's contention can be found in the following cases cited by plaintiffs, some of which we analyze. One of the cases cited by defendant supports our holding that plaintiffs did not produce,

manufacture, sell or handle a product within the meaning and contemplation of the insurance policy issued. The case cited by defendant is Hercules Company, Inc., v. Royal Indemnity Company (U.S.D.C.S.D. N.Y.) 171 F.Supp. 746. In that case plaintiff in the regular course of its business performed certain work on a steamship consisting of cleaning the deep tanks located in the holds of the vessel. Thereafter, plaintiff received notice from the steamship company alleging that the aforesaid work had been negligently performed and had resulted in accidental destruction of property in that plaintiff had permitted the rags used by it in the performance of said work to gain access to the bilge suction line from said tanks and permitted said rags to foul certain valves servicing the suction line, and that as a result thereof a portion of the liquid had escaped from the ship by reason of the negligence of the plaintiff.

The court in its opinion said: "The defendant maintains the insurance policy excluded claims arising from 'completed work.' The defendant relies upon two provisions of the insurance policy in support of this contention. One is that on the face of the policy there was the phrase 'Products (Including Completed operations) Excluded.' There is no doubt from this provision of the policy that the insurance did not cover *products, however, plaintiff did not sell products; it performed services.* The exclusion of a products liability, the premium for which under the policy would have been a certain percentage of sales, would certainly not have indicated to the average purchaser of insurance that there was an exclusion for liability for negligence in connection with services rendered by it. The claim of the Weyerhaueser Steamship Company was not for negligence in connection with products sold by the plaintiff, but rather was concerned with negligence in connection with work done by the plaintiff in connection with services rendered in the cleaning out of the hold of the ship, which was an item specifically covered by the policy. The exclusion which relates to 'products' manufactured or distributed by the insured, would not be an exclusion which would relate to services performed, out of which services the accident arose. No businessman reading this policy could reasonably assume from the rather ambiguous language used therein that the insured was not protected against the natural consequence of any negligence on its part in the performance of its services which constituted its regular business. If there is any ambiguity in the policy it must be construed against the insurance company." (Emphasis ours) (171 F.Supp. l. c. 748.)

The case often quoted and somewhat analogous to the factual situation in this case is that of Kendrick v. Mason, 234 La. 271, 99 So.2d 108. In that case Mason, a contractor, entered into an agreement with the Town of Jena, Louisiana, for the installation of a sewerage collection system. During the performance of the agreement Mason and his employees dug the trenches and laid the sewer lines, and in the course of this operation the natural gas lines which had been previously installed in the town of Jena were cut or punctured at various places. No effort was made by Mason to repair these cuts and damaged gas lines and, therefore, natural gas was permitted to flow and escape therefrom unchecked. As a result of this condition gas had accumulated in the sewer system and in a sewer pipe that lead into the Kendrick home. Thereafter *and beyond the completion date of the contract* there was an explosion causing total loss of the home and extensive personal injuries. The United States Fidelity and Guaranty Company who insured Mason denied liability to him for the alleged tort on the grounds that the damages did not occur during the time the work was being done. The same question presented here was raised in that case, namely, that the exclusion for "Completed Operations" as found in the Products Hazard section of the policy barred recovery. The Supreme Court of Louisiana in its opinion adopted certain excerpts from an opinion of the

Court of Appeals of the Second Circuit of Louisiana, in King v. Mason, 95 So.2d 705, wherein that court had made a detailed study of the provisions of the policy under scrutiny noting that the claimed exclusion appeared under the caption "Products Hazard—Completed Operations," (which policy provisions are similar to those contained in the policy here reviewed). The court said, quoting from the Court of Appeals decision: " 'In all probability, from a fair interpretation of the exclusion just referred to, the endorsement pertains to and excludes injuries arising out of the handling or use of products, goods, wares, or merchandise sold or rented if the insured has relinquished possession thereof to others and away from the premises owned, rented or controlled by the insured or on the premises for which the classification stated in Division (a) of the declaration excludes "any part of the foregoing," which could only mean the handling of goods or products of some kind.

" 'The defendant Mason handled no products, meaning "goods or products" manufactured, sold or distributed. He, therefore, did not want or need the coverage. The reference to the accident occurring after the operations have been completed and abandoned at or away from premises owned, rented or controlled by the insured means nothing more than the accidents occurring by reason of handling of products or goods, after any agreement to sell, rent or deliver the goods has been completed or the goods have been abandoned.' " (99 So.2d l. c. 116.)

The Supreme Court of Lousiana then went on to say, (l. c. 116) "It is significant that the policy contract does not recite that any of these exclusions pertains to or refers to contractors who have no products for sale but who have performed a contract for the installation of a public utility, as in the instant case, *or even the erection of any structure, public or private;* whereas the policy does specifically recite that the assured, C. N. Ma-

son, is a sewer and water main contractor. By no means of interpretation known to us can it be positively asserted that the exclusions in the policy and the endorsements attached thereto referred to contractors, and we deem it the fundamental duty of the insurer to express clearly the limitations of its obligation. (Emphasis ours).

"* * * In the instant case the exclusions and exceptions relied upon by the insurer to escape liability were not stated with clearness and precision, thereby defining the limits of its obligation therein. An analysis of the exclusion and exceptions therein clearly demonstrates an ambiguity and vagueness which under our well settled jurisprudence must be construed against the insurer. * * *

"We are constrained to conclude that the liability exclusion provisions of the policy herein issued by the defendant to Mason are inapplicable herein for the reason that Mason handled no products but was engaged solely as a contractor and the exclusion provisions of the policy have no application to the construction work performed by him. The policy was issued to fully protect Mason against liability for acts of negligence committed by him during his performance of the contract. The tort which was the proximate cause of the damages sustained by plaintiff was in fact and in law committed during the performance of the construction contract. * * * The policy covering said accidents for which premiums were charged was then in full force and effect; and the conclusion is inescapable that the insurer is therefore liable in solido with its insured, Mason."

In the case of Nielson v. Travelers Indemnity Co., D.C., 174 F.Supp. 648, affirmed 8 Cir., 277 F.2d 455, the insured was an excavating contractor and there, as here, the dispute was whether or not a claim arising after the contract had been completed would be covered under the terms of the policy. The court found that the

terms of the policy attempting to set up the exclusions were ambiguous and that the ambiguity would be resolved in favor of coverage. The court in so holding said: "Liability on the part of the contractor which arises after he has completed his contract and the subject matter of it is accepted by the other party to the contract is frequently referred to as completed operations liability. An independent contractor who erects a structure under a contract with the owner is not commonly regarded as being the manufacturer or vendor of a product. * * * There are also situations where an independent contractor furnishes services which do not involve the supplying of a product or material. Frequently the damage resulting from negligence of such person in connection therewith does not occur until some time after the services have been completed.

\* \* \* \* \* \*

"The cases heretofore discussed indicate that where an independent contractor is engaged in an activity in which no products or materials are used and coverage for such activity is purportedly given as to hazards in connection therewith in the declarations portion of his comprehensive liability policy, and in the printed portion of the policy there is a products hazard provision which contains a subdivision relating to the matter of completed operations, the situation is one which may give rise to doubt and ambiguity on the question of coverage. * * *

"The Court is of the view and finds under the circumstances in this case the terms of the policy are ambiguous as to the matter of coverage here involved and leaves that matter in doubt. Under the Iowa law such doubt and ambiguity are to be resolved in favor of the insured." (174 F.Supp. 1. c. 652, 662.)

For other supporting cases involving contractors see Hoffman and Klemperer Co. v. Ocean Accident and Guarantee Corp., 7 Cir., 292 F.2d 324; McAllister v. Century

Indemnity Co. of Hartford, 24 N.J.Super. 289, 94 A.2d 345, and McNally v. American States Insurance Company, 6 Cir., 308 F.2d 438.

We are in complete agreement with what was said in Kendrick v. Mason, supra; Nielson v. Travelers Indemnity Co., supra; and Hercules Co., Inc. v. Royal Indemnity Company, supra. The policy provisions under scrutiny in those cases were similar to the provisions relied upon by defendant in this case.

It appears clear to us that when plaintiffs purchased the comprehensive general liability policy relied on by them for recovery in this case, they meant to purchase and obtain general contractors protection against comprehensive claims arising out of their work and services in the performance of building Our Lady of Good Counsel School, including tort claims arising from their excavating operations. By no stretch of legalistic nomenclature or business language or understanding can it be said that the plaintiffs either manufactured, sold, handled or distributed any products. Their business was clearly stated in the insurance policy as that of "contracting." From the very nature of their business one can only conclude that they performed services. To the average person the term products hazard can only mean a hazard arising out of the use of or the existence of any condition in goods or products manufactured, sold, handled or distributed by the insured. The suits filed against plaintiffs herein involve no such hazard but are based only and solely on alleged negligence in connection with the excavation of the premises in question. Certainly plaintiffs were seeking comprehensive general liability coverage and were seeking a policy that would cover all manner of claims arising in the performance of their type of business. Certainly defendant's agent knew when he sold this type of coverage to plaintiffs that plaintiffs were not handling, manufacturing, distributing or selling a product but were simply

performing a service. When Murphy, the subcontractor, excavated the premises, he was performing a service and was not engaged in either manufacturing, selling, handling or distributing a product. Any contention to the contrary, under the facts in this case, is illogical, unsound and without good reason, and as said in the Hercules case, any exclusion which relates to "products" either sold, manufactured, handled or distributed by the insured would not be an exclusion which would relate to services performed out of which services the accident arose. We can do no better, in connection with the facts in the instant case, than to repeat what was said in the Hercules case: "No businessman (or other ordinarily intelligent person) reading this policy could reasonably assume from the rather ambiguous language used therein that the insured was not protected against the natural consequence of any negligence on its part in the performance of its services which constituted its regular business. If there is any ambiguity in the policy it must be construed against the insurance company." (Parenthesis ours.) (171 F.Supp. 1. c. 748.) We rule that the terms of the policy fully protected plaintiffs against liability for acts of negligence committed by them or by their subcontractor during the performance of the contract. The negligence committed by Murphy in the grading of the toe of the slope or incline was the proximate cause of the damages later sustained by the property owners who sued plaintiffs and was in fact and in law committed during the performance of the work while the insurance contract was in force.

■ In the cases analyzed hereinbefore and relied on by this court it is stated that the exclusions and exceptions relied upon by the insurer to escape liability were not stated with clearness and precision, thereby defining the limits of its obligation therein. These courts found in an analysis of the exclusions and exceptions that they clearly demonstrate an ambiguity and vagueness which under well settled jurisprudence must be construed against the insurer. This is a cardinal rule of construction in connection with determining the coverage of an insurance policy and needs no further citation of authority.

■ The next point urged by defendant is that the accident in question occurred in 1957, and not during the policy period, which was November 1951, to November 1952. Under those circumstances it contends that it cannot be held responsible for the damages shown in evidence.

The principal authority relied upon by the defendant is the case of Remmer v. Glens Falls Indemnity Company, 140 Cal. App.2d 84, 295 P.2d 19, 57 A.L.R.2d 1379. In that case the plaintiffs during the year 1947 graded and filled portions of their lot. On January 21, 1952, large quantities of earth and rocks slid from the fill on plaintiffs' property onto the property of the Morrises. The plaintiffs became obligated to reimburse the Morrises for part of that damage. The question presented was whether that loss was covered by the policy in question. The policy was a comprehensive personal liability policy issued to the plaintiffs on October 26, 1945, for a three year period. The policy was cancelled on January 15, 1948, and had never been renewed. The policy was in effect when the plaintiffs graded and filled their property but was not in effect in January of 1952, when the slide occurred that damaged the property of the Morrises. The court pointed out that the Morrises' recovery was based upon the present threat to and depreciation of their land and caused by the current maintenance of the balance of the rocks. The damages sued for and recovered occurred after the policy was cancelled in 1948.

In the case of Morris v. Remmer, among other things, the trial court found that the grading and filling performed in 1947 were not executed in a negligent manner. In the case reviewed by the court it found:

"We are not interested in ascertaining what theory the Morrises could have sued upon, but on what theory they did sue upon. This is to be determined from the pleadings. Clearly, that complaint, without ambiguity, was for damages for the present nuisance, currently maintained and currently threatening injury, and for its abatement. The cause of action pleaded was necessarily, therefore, not for an 'occurrence' happening within the time limits of the policy." (295 P.2d 1. c. 22). The court pointed out that the suit filed by the Morrises was for damages caused by a present existing nuisance and that although the nuisance was an injury when created in 1947, for which the Remmers were liable and although such injury occurred during the effective term of the policy, no action was ever brought for that injury. This case does not support defendant's contention because the cause of action reviewed there was one for a present nuisance currently maintained and currently threatening injury and wherein the Morrises had asked for its abatement. Opposing the contention of defendant is the language of the opinion which held that the nuisance was an injury when created in 1947 for which the Remmers were liable, which was during the time the policy was in effect and at which time no actual occurrence had taken place. Nevertheless, the court held inferentially that an action could have been brought for injury created by the nuisance.

As said in a note found in 57 A.L.R.2d 1389, as an annotation to the Remmer case, "Since the terminology of the policies involved is not uniform, no general rule can be stated in connection with the question, other than the well-recognized principle of the law of insurance that the policies, having been prepared by the insurer, must be construed most strongly against it and in favor of the insurer."

In a case called to our attention by plaintiffs we find a situation that almost parallels the instant situation under review. In the case of the Travelers v. Humming Bird Coal Co., (C. of A.) Ky., 371 S.W.2d 35, the Humming Bird Coal Company brought suit against the Travelers to recover under two policies of insurance. The first issued February 6, 1956, and covering the period from February 24th, 1956, to February 24th, 1957, and a renewal issued July 8, 1957, and covering the period from September 10, 1957, to September 10, 1958. In that case the defendant Travelers agreed in both contracts to "pay to the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by accident and arising out of hazards hereinafter defined." (371 S.W.2d 1. c. 37.) In October 1956 the Coal Company began surface or strip mining on a mountain side and bulldozed the surface until a bench or shelf was established 30 or 40 feet wide and about 600 feet above the highway at the base of the steep mountain slope. A large amount of earth and debris was removed and pushed over on the slope of the mountain. The Coal Company began to mine coal and continued until December 1956 and all the machinery was moved away by March 1957. Prior to December 1956 the earth mass on the slope began to move or slip, not all at once but gradually and slowly until it reached the border line of the Melton farm below, overrunning Melton's water supply and damaging him seriously. The exact time this earth mass passed over the boundary of the Melton land was not shown and the process may have taken weeks and even months but it had its beginning before December 1956 and before the actual mining ceased on the hill. On September 26, 1958, Melton filed suit against the coal company. The Travelers were called upon to defend the suit and refused to do so. The suit was settled and the suit under review by the court was filed and judgment was given in the trial court against the defendant Travelers.

The court said: "The leading defense of defendant Travelers is that the injury to the Melton property was not an accident within the meaning of the policy. Here lies

a misconception. The accident mentioned in the policy need not be a blow but may be a process. * * * Where the accident is a process, how long is then not significant whether it takes three hours, three weeks or months. * * *

"This policy should not be interpreted so narrowly or rigidly as to destroy a recovery for a loss clearly traceable to the operation of plaintiff's Coal Company's business. Such contracts must be construed liberally." (371 S.W.2d 1. c. 38).

In our case the trial court found and we find that the initial shift or slide of land was first detected or noticed while Murphy was still grading and excavating the field adjoining the damaged properties and that this condition was directly related to the grading and excavating which was then in progress. The trial court further found and we find that thereafter there was a reoccurrence of the condition and it became progressively worse. The trial court found and we find that the damages which formed the bases of the five lawsuits were directly attributable to the grading and excavating operations conducted by Murphy and that those operations caused or contributed to cause a movement and instability of the ground. The trial court found and we find that the initial shift or slide of land occurred during the period the policy in question was in force.

There is no doubt that the negligence which caused the inital shift or slide of land was the proximate cause of the damages later sustained by the plaintiffs and that this cause was an accident within the meaning of the policy. We agree, as did the court in the Humming Bird Coal Company case, that the accident mentioned in the policy may be a process and the evidence in the instant case is sufficient to show that the process started during the term of the policy and progressed until the filing of the five lawsuits. We rule this point against defendant.

In the final point urged by defendant it contends that the trial court erred in awarding damages for vexatious delay and attorneys' fees, contending that § 375.420 RSMo. 1959, 19 V.A.M.S., providing for statutory penalties for vexatiously refusing to pay said loss, is not applicable. It contends that this is a case of first impression in this state, with conflicting authorities in other jurisdictions, and that it is entitled to seek judicial construction of the policy in question in this state.

The section of the statute referred to is highly penal and is strictly construed. It is the rule in this state, supported by many cases, that where there is an open question of law or an issue of fact determinative of the insurer's liability, the insurer, acting in good faith, may insist upon a judicial determination of such question or issue without being penalized therefor. Rohlfing v. State Farm Fire and Casualty Company, Mo.App., 349 S.W.2d 472, and cases therein cited. In order for plaintiffs to recover for vexatious refusal to pay they must produce evidence which shows that the refusal to pay was willful and without reasonable cause as the facts would appear to a reasonable and prudent man before trial. Merely because the verdict after trial is adverse to defendant's contention is no reason for inflicting the penalty. Rohlfing v. State Farm Fire and Casualty Company, supra.

The trial court in its memorandum opinion indicated that the authorities relied upon by plaintiffs did not include precisely all the elements involved in the instant cause and differ in certain respects. However, the court said: "they do announce certain principles which *tend* to support plaintiff's position." Therefore, the trial court indicated that the authorities relied upon by plaintiffs did not unquestionably and clearly support plaintiffs' position. We think defendant had the right to insist upon a judicial determination of the questions involved in the construction of the insurance

policy and on some issues of fact determinative of its liability without being penalized under the section of the statutes referred to. The question involved in the construction of the insurance policy was new to this state. Further, we fail to find any evidence of bad faith on the part of defendant when it insisted upon a judicial determination of the legal and factual questions. Apparently plaintiffs were of the same view for they failed to discuss this point in their brief.

The judgment of the lower court should be reversed and the cause remanded with directions to enter a new judgment in favor of plaintiffs and against defendant for $10,638.80. It is so ordered.

WOLFE, J., and WILLIAM M. KIMBERLIN, Special Judge, concur.