KNUTSON CONSTRUCTION
COMPANY, petitioner,
Appellant,

v.

ST. PAUL FIRE AND MARINE INSURANCE COMPANY, et al., United States Fire Insurance Company, Northbrook Excess and Surplus Insurance Company, Respondents,

Integrity Insurance Company, et al., Defendants.

No. C9–84–1253.

Supreme Court of Minnesota.

Nov. 21, 1986.

Timothy M. O'Brien, Minneapolis, for appellants.

Timothy P. Tobin, Minnetonka, for St. Paul Fire and Marine Insurance Company, et al.

Mark W. Gehan, St. Paul, for U.S. Fire Insurance Company.

Robert J. McGuire, Minneapolis, for Northbrook Excess and Surplus Ins. Company.

Timothy W. Waldeck, Minneapolis, for Integrity Ins. Co.

Jay L. Bennett, Minneapolis, for New England Peinsurance Corp.

A. Patrick Leighton, St. Paul, for Associated General Contractors of Minnesota, amicus curiae.

KELLEY, Justice.

Appellant Knutson Construction Company (Knutson), a general contractor, purchased comprehensive general liability insurance policies (CGL) with a completed operations and broad form property damage endorsement (BFPD) from respondent insurance companies: St. Paul Fire and Marine (St. Paul Fire), St. Paul Mercury Insurance Company (Mercury), and United States Fire Insurance Company (USF). During the policy periods, Knutson was the general contractor on a project to erect a large apartment complex. Years after completion of the project, the owner sued Knutson alleging extensive damage to the project building due to a breach of contract, negligence, and other claims. After St. Paul Fire and USF had declined to defend or indemnify it, Knutson commenced this declaratory judgment action alleging coverage under the policies. Relying on *Bor-Son Building Corp. v. Employers Commercial Union*, 323 N.W.2d 58 (Minn.1982), the trial court granted summary judgment motions made by the insurers. The court of appeals affirmed. *Knutson Construction Co. v. St. Paul Fire and Marine Insurance Co.*, 366 N.W.2d 738 (Minn.App.1985). We affirm.

Respondent St. Paul Fire had issued Knutson comprehensive general liability policies with a broad form property damage endorsement, including completed operations, from January 1, 1973, through March 1, 1979. USF had issued virtually

identical policies from March 1, 1979, through March 1, 1982.

In June 1973, Knutson contracted with Gateway Investors, Ltd. (Gateway) to construct, as general contractor, a 16–story building called Rivergate Apartments. Knutson contracted to furnish all materials and to perform all the work according to drawings and specifications prepared by architects and engineers under contract with Gateway.[1] Knutson additionally agreed to correct any defects due to faulty materials or workmanship appearing within one year of the date of substantial completion of the project.

Construction began in 1973 and ended in 1975. Knutson subcontracted with independent contractors and suppliers to provide much of the labor and material for the project, including caulking and sealing, installation of windows, prefabricated brick masonry panels, plumbing, heating, ventilating and air conditioning work. Gateway contracted directly with a manufacturer for supply of the windows. Architects hired by Gateway supervised the project.

Rivergate was certified as complete on May 22, 1975. Four years later, during the winter of 1979–1980, the owner of the Rivergate Apartments found excessive cracks, staining and spalling (chipping) on the exterior brick work of the building. Further examination revealed individual bricks and some prefabricated brick panels were loosening and steel connectors in contact with the brick panels and mortar were corroding. The owners considered these structural defects a substantial threat to the safety of Rivergate residents and passersby.

Other problems alleged since completion of the building involve the heating and air conditioning systems and difficulty with the windows which allegedly failed to seal out air and moisture or to open and close properly.

Gateway, and its managing general partner, Sentinel Management Company, sued Knutson Construction Company, among others, in March, 1981, to recover building repair costs.[2] The complaint alleges Knutson breached its construction contract by using defective materials and employing improper methods, not complying with project specifications, not performing in a professional, workmanlike manner and generally "failing to construct and complete a sound durable structure." Knutson was also charged with negligence, breach of warranty and misrepresentation in relation to the building's masonry work, heating, air conditioning and window installation.

After St. Paul Fire and USF declined to defend that suit, Knutson commenced this declaratory judgment action. The trial court held and the court of appeals agreed that *Bor-Son* was dispositive and both courts ruled in favor of the respondent policy insurers.

On appeal to this court, Knutson asserts that the courts below erred because of existence of factual and legal differences distinguishing the contractor's undertaking in *Bor-Son* as compared to Knutson's undertaking in the Rivergate project. Factually, Knutson contends the major difference is that *Bor-Son* arose out of a "turn-key" project, one in which the owner had

---

1. Knutson Companies, Inc., parent corporation of Knutson Construction Co., was a general partner of Gateway Investors, Ltd., Rivergate project owner, at the time the contract was signed. Knutson Companies, Inc. sold all but one-tenth of one percent of its partnership interest in Gateway to LandTech Management Corp. on December 19, 1974, effective January 1, 1975. The sale agreement lists the principal asset of Gateway as land upon which the Knutson Construction Company is constructing a 269–unit high-rise apartment according to specifications entitled Elderly Housing Project for Knutson Development Company. The agreement further states the project is under a con-

struction contract "pursuant to which Knutson Construction has agreed to provide all materials and perform all work of construction for a fixed price of $3,628,983." *Id.* LandTech later changed its name to Sentinel Management Company, and became the managing general partner in Gateway and a co-plaintiff in the underlying action to this case.

2. Others named as defendants in the complaint and amended complaint include the project's architects and engineers, subcontractors, suppliers of materials and the company which issued the performance bond.

no involvement until the project was completed and the contractor-developer gave the owner a key to turn in the door, whereas in this case, Knutson contends, the general contractor had less control and overall responsibility for the project. Knutson notes Gateway retained the project architect who prepared the plans and specifications and that it contracted directly with the supplier of the windows. Thus, Knutson concludes the Rivergate project, unlike the project in *Bor-Son*, cannot be regarded as the sole work or product of Knutson. Implicit in this assertion is the contention that the general contractor cannot control risks of defective workmanship by its subcontractors.

Respondents reply that the fact that *Bor-Son* involved a turnkey project is without significance.[3] As in *Bor-Son*, they assert, Knutson bore the ultimate contractual responsibility to provide all labor and materials for the Rivergate project. They conclude, therefore, Knutson had "effective control" over the project, including the work of subcontractors such that Knutson was ultimately accountable for delivering a defect-free building to Rivergate.

Striking factual similarities exist between *Bor-Son* and this case. Both involved housing projects in which each owner hired a supervising architect for its project. In both cases, each general contractor was contractually bound to furnish materials and work for the project. In each case, the general contractor agreed to correct any defects due to faulty materials or workmanship appearing within a year of the building's completion. Both general contractors were sued by owners for damage to the buildings allegedly caused by the use of defective materials and workmanship. As in *Bor-Son*, the owner here, Rivergate, sought only costs for correcting defects in the building itself. No third party claims involving injuries or other property damages were involved in either underlying action commenced by the own-

ers. Additionally, the comprehensive general liability insurance policies in both declaratory judgment actions are substantially identical. In both instances, the policies contain BFPD endorsements and completed operation endorsements. It is therefore apparent that both courts below correctly concluded that the relevant facts of this case are indistinguishable from those in *Bor-Son*.

Is there a legal distinction between the two cases? Respondents contend that the legal issues presented in this case cannot be distinguished from our *Bor-Son* holding. In *Bor-Son*, we held the standard CGL policy does not cover contractual claims to repair building defects caused by faulty materials and workmanship. We delineated the difference between contractual business risks, assumed by the general contractor, and risks of tort liability to third parties, assumed by the insurer, as follows:

> The risk intended to be insured is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the product or completed work itself, and for which the insured may be found liable. The insured, as a source of goods or services, may be liable as a matter of contract law to make good on products or work which is defective or otherwise unsuitable because it is lacking in some capacity. This may even extend to an obligation to completely replace or rebuild the deficient product or work. This liability, however, is not what the coverages in question are designed to protect against. The coverage is for tort liability for physical damage to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained.

323 N.W.2d at 63 (quoting Henderson, *Insurance Protection for Products Liability and Completed Operations—What Every*

---

**3.** Actually, *Bor-Son* involved a semi-turnkey project because the owner had provided interim financing.

*Lawyer Should Know,* 50 Neb.L.Rev. 415, 441 (1971)). Because all the damages claimed by HRA arose out of *Bor-Son's* breach of contract (that is, faulty workmanship and defective materials), there was no coverage under the CGL policy. *Id.*

Respondents note that the business risk arising out of contract, and assumed by Knutson as general contractor, as well as the kind and nature of damage claimed by Gateway and Sentinel, as owners, is identical to the damages claimed by the HRA in *Bor-Son.* They urge that we adhere to the rule in *Bor-Son* because it is consistent with the underwriting intent of comprehensive general liability policies. They assert abandonment of the *Bor-Son* rule, which would result in transferring the loss due to faulty construction from the contractor, who has engaged to complete a structure in a good workmanlike manner, to the CGL insurer would serve to encourage substandard construction, or even fraud, which would be against the public policy of the state. Respondents argue that risk of loss to work itself caused by poor workmanship or the contractor's use of inferior materials should rest with the contractors who can control those risks by completing projects in a workmanlike manner, whereas the

CGL insurer is in no position to reduce such risks. The insurers aver that to impose such risks on the CGL insurer will make the cost of CGL insurance prohibitive because, in effect, the policy will become a performance bond.

On the other hand, appellant Knutson argues that even if it be conceded that the underlying facts in *Bor-Son* and the instant case are indistinguishable, *Bor-Son* has no precedential value because it did not consider relevant provisions in the CGL policy as modified by the BFPD endorsement.[4] In essence, Knutson claims that the BFPD endorsement modifies the "work performed" exclusion of the CGL policy, Exclusion T, thereby granting coverage to the general contractor for claims arising out of the work which the contractor engaged to perform.[5]

An analysis of the issue commences with the consideration of elementary insurance principles. In exchange for the payment of a premium, an insurer assumes certain risks that otherwise would be the obligation of the insured. In order to have predictable and affordable insurance rates, the insurers' assumptions of risk are usually limited to those beyond the "effective

---

**4.** That contention is untenable. *See* discussion *infra,* 235–36, n. 11.

**5.** The St. Paul Fire policy, as well as the USF policy, contained exclusions from coverage. In particular, they contained exclusions (p), (s) and (t):
(p) To property damage.
(1) To property owned or occupied by or rented to the Insured, or except with respect to the use of elevators, to property held by the Insured for sale or entrusted to the Insured for storage or safekeeping;
(2) Except with respect to liability under a written sidetrack agreement or the use of elevators to:
(a) Property while on premises owned by or rented to the Insured for the purpose of having operations performed on such property by or on behalf of the Insured;
(b) Tools or equipment while being used by the Insured in performing his operations;
(c) Property in the custody of the Insured which is to be installed, erected or used in construction by the Insured;

(d) That particular part of any property, not on premises owned by or rented to the Insured;
(1) Upon which operations are being performed by or on behalf of the Insured at the time of property damage arising out of such operations; or
(2) Out of which any property damage arises; or
(3) The restoration, repair or replacement of which has been made or is necessary by reason of faulty workmanship thereon by or on behalf of the insured;
(s) To property damage to the Named Insured's products arising out of such products or any part of such products.
(t) (Broad Form Property Damage Endorsement)
With respect to the completed operations hazard, to property damage to the work performed by the Named Insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith.

control" of the insured. That principle applies to the CGL insurance policy.[6]

In every construction project, the owner and contractor incur risks or exposure to loss. Some of these risks can be shifted to insurers—others cannot. The owner has the risk that the contractor will fail to properly perform his contractual obligations. This risk can be shifted by the owner either securing, or requiring the contractor to provide, a performance bond.[7] The owner likewise has the risk the project may be destroyed by fire, explosion or the like during construction. The contractor may have a similar risk. Either or both may shift that risk to an insurer by acquiring a builder's risk policy. Again, such losses are generally beyond the effective control of either the contractor or the owner. Finally, the owner has the risk of being subject to claims of third parties who claim to have sustained property damage or personal injury as the result of the project being defectively constructed. The contractor is likewise subject to this risk. The owner's risk, however, is usually derivative since the claims usually arise from defective workmanship or materials used by the contractor. This risk of third party personal injury or property damage claim due to defective workmanship or materials may be shifted by the contractor purchasing a comprehensive general liability insurance policy to protect against loss to third persons or their property during the course of the work or, if a completed operations endorsement is paid for, thereafter. However, in addition to and apart from those risks, the contractor likewise has a contractual business risk that he may be liable to the owner resulting from failure to properly complete the building project itself in a manner so as to not cause damage to it. This risk is one the general contractor effectively controls and one which the insurer does not assume because it has no effective control over those risks and cannot establish predictable and affordable insurance rates. Nonetheless, appellant urges us in this case to hold that by the purchase of a CGL policy, a contractor shifts to the insurer this business risk which it effectively controls. Unlike the surety on a performance bond, a CGL insurer has no recourse against a contractor for the employment of defective materials or shoddy workmanship on the construction project.

■ Even though it cannot be conclusively demonstrated that adoption of appellant's proposed holding would promote shoddy workmanship and the lack of exercise of due care, undoubtedly it would present the opportunity or incentive for the insured general contractor to be less than optimally diligent in these regards in the performance of his contractual obligations to complete a project in a good workmanlike manner. To accept the appellant's contention would be to provide the contractor with assurance that notwithstanding shoddy workmanship, the construction project would be properly completed by indemnification paid to the owner by the comprehensive general liability insurer. In and of itself, the incentive for the contractor to fairly and accurately bid a contract in order to secure the job would be removed. Even if such result would not always be inevitable, the possibility of such consequences, in our view, is incompatible with the general public policy concerning the relationship

6. *See* G.H. Tinker, *Comprehensive General Liability Insurance—Prospective In Overview,* 25 Fed'n. Ins. Coun. Q., 217, 224 (1975) wherein the author explains the purpose of the CGL policy as follows:

> It is not the function of the CGL policy to guarantee the technical competence and integrity of business management. The CGL policy does not serve as a performance bond, nor does it serve as a warranty of goods or services. It does not ordinarily contemplate coverage for losses which are a normal, frequent or predictable consequence of the business operations. Nor does it contemplate ordinary business expense, or injury or damage to others which results by intent or indifference.

7. If the contractor defaults, the owner can look to the surety for indemnification of the cost of repairs or completion of the work. Even so, the ultimate responsibility rests with the contractor who is liable to the surety who has indemnified the owner or completed the work. Therefore, even though the owner can shift the risk over which he has no "effective control," the contractor cannot.

between contractors and owners. Those policy reasons were best articulated in *Centex Homes Corp. v. Prestressed Systems,* 444 So.2d 66 (Fla.App.1984):

> It is well established that the purpose of comprehensive liability insurance coverage is to provide protection for personal injury or property damage caused by the product only and not for the replacement or repair of the product. [citations omitted] The policy reasons for this result are obvious. If insurance proceeds could be used to pay for the repairing and/or replacing of poorly constructed products, a contractor or subcontractor could receive initial payment for its work and then receive subsequent payment from the insurance company to repair and replace it. [citations omitted] Equally repugnant on policy grounds is the notion that the presence of insurance obviates the obligation to perform the job initially in a workmanlike manner.

*Id.* at 66–67.

An exclusion in the CGL policy clearly excludes coverage for damage or injury to this project which is expected or intended by the insured. But liability for damage to the project itself encompasses much more than intentional acts of contractor misdoings. No matter how diligently and how assiduously a contractor attempts to control the workmanship and materials used on the project, when, in spite of those efforts, the projects fall short, the consequences of the failure is endemic in a commercial undertaking. *Weedo v. Stone-E-Brick,* 81 N.J. 233, 405 A.2d 788 (1979).[8] Recognizing these well-established insurance principles, we held in *Bor-Son* that claims for damage to the project itself were not covered under the contractor's comprehensive general liability policy. We there

labeled claims of this type as "business risk." *Bor-Son Building Corp. v. Employers Commercial Union,* 323 N.W.2d 58, 61 (Minn.1982). Even though an examination of the CGL policies in this case, as well as the policy in *Bor-Son,* will reveal no exclusions specifically designated as "business risk," in insurance law the scope of the phase is well understood. As explained in an article by G.H. Tinker, entitled *Comprehensive General Liability Insurance—Prospective and Overview,* 25 Fed'n Ins. Coun. Q. 217, 224 (1975):

> "Business Risks," then, are those risks which management can and should control or reduce to manageable proportions; risks which management cannot effectively avoid because of the nature of the business operations; and risks which relate to the repair or replacement of faulty work or products. These risks are a normal, foreseeable and expected incident of doing business and should be reflected in the price of the product or service rather than as a cost of insurance to be shared by others.

In the policies at issue here, such "business risk" type exclusions can be found, for example, in exclusions "P," "S" and "T" of the St. Paul Fire policies.[9] These exclusions generally operate to exclude coverage for claims arising out of the insured's product when the claim for relief seeks replacement or repair of damages to the product itself. Therefore, absent other considerations, we reaffirm our holding in *Bor-Son* that the CGL policy does not provide coverage for claims of defective materials and workmanship giving rise to a claim for damage to the property itself which is the subject matter of the construction project.

---

**8.** The New Jersey court explained the risk as follows:

> The insured-contractor can take pains to control the quality of the goods and services supplied. At the same time he undertakes the risk that he may fail in this endeavor and thereby incur contractual liability whether express or implied. The consequences of not performing well is part of every business venture; the replacement or repair of faulty

goods and works is a business expense, to be borne by the insured-contractor in order to satisfy customers.

*Id.,* 405 A.2d at 791.

**9.** Exclusion "P" is the "owned or occupied" exclusion; Exclusion "S" is the "products" exclusion; and Exclusion "T" is the "work performed" exclusion.

■ But does the existence of the BFPD endorsement in these policies, as appellant contends, operate to provide coverage that would otherwise be excluded under the CGL policy for the claims made by Rivergate? Consistent with *Bor-Son*, we hold it does not.

Appellant asserts that we did not address the BFPD endorsement in *Bor-Son*, and therefore "the entire analysis of the opinion and all the authority it cites is outdated, obsolete, and of no application." Appellant is in error. We did consider Knutson's BFPD contention and there rejected it.[10] The issue was raised in the *Bor-Son* briefs as well as in the petition for rehearing.[11] We rejected that claim in *Bor-Son* because the general contractor was fully responsible for all phases of the project—even though there it had subcontracted *all* of the work on the project. Here, Knutson retained portions of the work for itself. Nevertheless, in both instances, the structure became the contractor's product.[12]

Notwithstanding our rejection of similar assertions raised in *Bor-Son*, appellant Knutson argues that the removal of the words "or on behalf of" in the work performed exclusion from the BFPD exclusion expands coverage to include coverage for the claims now being asserted against Knutson by Rivergate.

In some construction projects, the general contractor has overall responsibility in control of the construction of the building. In *Bor-Son* that exclusive control and responsibility was considered decisive. On other construction projects, the so-called general contractor has something less than overall control of the work of subcontractors. *See, e.g., Ohio Casualty Insurance Co. v. Terrace Enterprise, Inc.,* 260 N.W.2d 450 (Minn.1977). Here, however, as in *Bor-Son*, Knutson, by contract, undertook to furnish all materials and labor. It had responsibility for all construction work—its own as well as its subcontractors. It had "effective control" over all project work and materials, including those provided by subcontractors. When the completed project is turned over to the owner by the general contractor, all of the work performed and materials furnished by subcontractors merges into the general contractor's product—a product it has contracted to complete in a good workmanlike manner. Thereby it incurred the business risk of liability arising from its failure to fulfill that contractual obligation. Thus,

---

**10.** Appellant also argues that *Federated Mut. Ins. Co. v. Concrete Units,* 363 N.W.2d 751 (Minn. 1985), casts "serious doubt" on *Bor-Son* because the court "declined to reaffirm the *Bor-Son* rule" and "refused to forsake the terms of the policy for vague and ill-defined 'business risk' principles." That contention likewise is meritless. *Bor-Son* was not even cited in *Federated Mutual*, and for good reason. The issue present here and in *Bor-Son* was not involved in *Federated Mutual*. The issue in *Federated Mutual* was whether "loss of use damages" were "property damage" within the terms of the comprehensive general liability policy. We held they were. That holding was consistent with *Bor-Son*. *See* 323 N.W.2d at 62 n. 6.

**11.** It was likewise raised in *Bor-Son* in a brief filed by the Associated General Contractors of Minnesota (AGC) as *amicus curiae*. AGC, as *amicus curiae* in the instant case, advances practically the same contentions here as it did there.

**12.** Appellant Knutson argues the building was not a "product" within the meaning of the product exclusion. Consistent with the majority of the courts which have addressed the issue, we

held in *Bor-Son* that the buildings were a "product." 323 N.W.2d at 63. *See also Quality Homes v. Bituminous Cas. Co.,* 355 N.W.2d 746 (Minn.App.1984) (house). Supportive of this conclusion are *S.W. Forest Indus., Inc. v. Pole Bldgs., Inc.,* 478 F.2d 185 (9th Cir.1973) (industrial building); *Home Indem. Co. v. Miller,* 399 F.2d 78 (8th Cir.1968) (completed home a contractor's product); *St. Paul Fire & Marine Ins. Co. v. Coss,* 80 Cal.App.3d 888, 145 Cal.Rptr. 836 (1978) (house); *Constr. Corp. v. Charter Oak Fire Ins. Co.,* 66 A.D.2d 315, 414 N.Y.S.2d 385 (1979) (school building a product); *Zanco, Inc. v. Michigan Mut. Ins. Co.,* 11 Ohio St.3d 114, 464 N.E.2d 513 (1984) (defects in condominium complex came under products exclusion); *Haugan v. Home Ind. Co.,* 86 S.D. 406, 197 N.W.2d 18 (1972) (products exclusion, among others applies to defectively built aircraft hanger and office building). *Contra, see Johnson v. Nat'l Union Fire Ins. Co. of Pittsburgh,* 56 Misc.2d 983, 289 N.Y.S.2d 852 (1968) and *Kissel v. Aetna Casualty & Sur. Co.,* 380 S.W.2d 497 (Mo.App. 1964) both of which, however, involved third party claims.

whether the work was "done by" or "on behalf of" the general contractor is irrelevant to the analysis. The completed product is to be viewed as a whole, not as a "grouping" of component parts.[13] The CGL policy excludes damage to the product for the exact public policy reasons hereinbefore discussed. Slight difference in wording in the work performed exclusion in the BFPD endorsement does not affect this exclusion.

■ We are not alone in this analysis. This precise issue was addressed in *Tucker Construction Co. v. Michigan Mutual Insurance Co.*, 423 So.2d 525 (Fla.App.1982). There, as in this case, a general contractor by contract agreed to build a building. The general contractor hired a soil-testing firm which recommended a method of installing the foundation. Sometime after completion of the structure, its floor began to settle. The general contractor blamed the settling on the work and services performed by the subcontracting soil-testing firm. The general contractor submitted a claim to its insurer which had written a CGL policy providing coverage for property damage including completed operations and BFPD coverage. The completed operations coverage contained the same exclusion at issue in this case—that is, the words "or on behalf of" contained in the CGL policy had been omitted, and, as in this case, the omission resulted from a substitution of an exclusion containing the words "work performed by the named insured." There, as here, the general contractor argued its CGL policy containing the identical BFPD and completed operation endorsement provided coverage because the building defects were caused by the subcontractor.

In rejecting that assertion, the court stated:

> The deletion of the phrase relating to subcontractors in the exclusion in the completed operations policy makes sense because the insured contractor has presumably accepted the subcontractor's work as his own (at least so far as its potential tort liability is concerned), and has turned the completed work over to the owner by the time such a completed operations policy is operative.
>
> In effect the applicable exclusion provides that the "completed operations" hazard coverage does not apply "to property damage to work performed by the named insured arising out of such work or any portion thereof." The words "work performed by" in this context in the policy mean the same as "the restaurant constructed by" the insured and was intended to exclude coverage of the insured's contractual liability for damages to the "work" caused by the insured's neglect or failure to complete and deliver the completed "work" in accordance with his contractual undertaking with the owner.

*Id.* at 528. Thus, it appears the Florida court followed the same analysis as this court utilized in *Bor-Son*. The result is that, regardless of the BFPD and completed operation endorsement, the general contractor ordinarily may not pass on to its CGL insurer the risk that the contractor may be called upon to repair defective work or replace defective materials which it, the general contractor, is, by contract solely responsible for.[14]

The trial court and the court of appeals correctly held that *Bor-Son* precluded cov-

13. Of course, the general contractor may have a remedy for contribution, indemnity or otherwise against subcontractors who breached contracts.

14. Appellant Knutson and the dissenter in the court of appeals rely on *S.W. Louisiana Grain, Inc. v. Howard A. Duncan, Inc.*, 438 So.2d 215 (La.App.1983) which held the modified language in the BFPD endorsement when viewed along-

side the completed work exclusion created an ambiguity, and therefore construed it against the insurers so as to afford coverage. When considered in connection with the allocation of construction risks and principles of insurance, we can ascertain no perceived ambiguity. Nor is the cursory treatment of the issue in *C.O. Falter, Inc. v. Crum & Forster Ins. Companies*, 79 Misc.2d 981, 361 N.Y.S.2d 968 (1974) persuasive.

erage to Knutson against Rivergate's claims. Accordingly, we affirm.[15]

---

**15.** We do not address the issue of whether the warranty exceptions in the policies (St. Paul Fire (g) and USF(a)) are applicable because not briefed by appellant. *See Melina v. Chaplin,* 327 N.W.2d 19 (Minn.1982).