**BOR–SON BUILDING CORPORATION,**
Respondent,

v.

**EMPLOYERS COMMERCIAL UNION
INSURANCE COMPANY OF
AMERICA, et al., Appellants.**

No. 81–704.

Supreme Court of Minnesota.

Aug. 20, 1982.

Rehearing Denied Nov. 19, 1982.

Gislason & Martin, and James T. Martin, Edina, for appellant.

Stolpestad, Brown & Smith, Russell C. Brown and Edward F. Fox, St. Paul, for respondent.

KELLEY, Justice.

Employers Commercial Union Insurance Company of America and Employers Liability Assurance Corporation, Ltd. (Commercial Union) appeal from an order and judgment of the Ramsey County District Court holding that Commercial Union breached its duty to defend and afford coverage under a comprehensive general liability insurance policy to its insured, Bor-Son Building Corporation (Bor-Son), and that Commercial Union was required to reimburse Bor-Son for its contribution to a settlement of a lawsuit commenced against it and others by the Duluth Housing and Redevelopment Authority (HRA). The trial court also ordered Commercial Union to pay attorneys fees in that action as well as attorneys fees in this declaratory judgment action. We reverse.

In 1968, HRA decided to build two high-rise apartment complexes for the elderly in Duluth. One was known as the Midtowne project and the other was known as the Ramsey project. Bor-Son bid on and was awarded the contract on the Midtowne project. Thomas Shefchik, a registered architect, was awarded the contract on the Ramsey project. Shefchik immediately assigned the actual construction on the Ramsey project to Bor-Son. Each proposal called for "turnkey" construction, which requires a contractor to acquire a building site, design the building, provide interim financing and provide all the manpower and materials to construct the building.[1] When all the plans and specifications had been approved by HRA, HUD, and the City of Duluth, Bor-Son acquired the necessary parcels of land for the projects and eventually sold the land to the HRA by a contract for deed. The contract for deed also contained all the terms for the projects. Bor-Son was required to furnish a performance bond and comprehensive general liability insurance coverage for each project. It made arrangements with Commercial Union for both requirements.

Bor-Son did not do any of the actual work on the projects. Instead, it hired 15 different subcontractors to complete the construction. Bor-Son did supervise the work as it progressed through one of its employees, Eugene A. Wagner. Wagner generally maintained the work schedule by coordinating the subcontractors and focused on the major parts of the construction. Bor-Son also made arrangements with one of its larger subcontractors, United General Constructors, to furnish a job superintendent and foreman. In addition, HRA retained an inspecting architect to make sure the projects were proceeding according to the plans and specifications. This architect was on the job sites of these two projects on a daily basis.

Construction on both buildings began in late 1969. As the construction progressed, some problems with water leakage surfaced, but Bor-Son's supervisor Wagner attributed those problems to lack of waterproofing and caulking that, at the time, had not been applied to the buildings. The buildings were substantially completed and accepted by HRA in April 1971. A "memorandum of acceptance for occupancy" was executed on each project, and attached to each memorandum was a purchaser's architect statement. That statement was what is commonly known as the "punch list," which contained items that needed to be done to complete the building. The statement also contained a sentence: "Except as reported to the Housing and Redevelop-

---

1. This construction is known as "turnkey" because the owner (here HRA) has no involvement until the building is complete, and the contractor-developer gives the owner a key to turn in the door. The turnkey developer incurs a higher risk than the ordinary building contractor. Since the contractor-developer is responsible not only for the building's construction but also for its design and performance, the developer essentially warrants that the building is fit for its intended purpose. As it turned out, these projects ultimately became "semi-turnkey" because HRA provided the interim financing because it could get a lower interest rate. However, Bor-Son was still responsible for the design of Midtowne and Shefchik was responsible for the design of Ramsey.

ment Authority, and noted in the punch list, the property is in good merchantable condition." The "punch list" contained nothing to indicate either that the buildings were experiencing water infiltration problems or that additional work was needed to assure prevention of water damage.

Shortly after the buildings were turned over to HRA, severe water leakage problems developed in both buildings. Bor-Son began to receive letters and calls from HRA that a number of the apartments were having water problems and were leaking. These problems would increase or decrease, depending upon the type of storm and the amount of rain. Bor-Son, through its employees, visited the sites and became involved in efforts to try to identify and correct the problems. Subcontractors and suppliers were involved in the process, but, over a period of some time, all attempts to cure the problems were generally unsuccessful.

Finally, in 1975 HRA brought two suits (one for each project) against Bor-Son, as contractor, and Commercial Union, as surety on the performance bond. These suits alleged that the water leakage was due to defects caused by faulty materials and workmanship resulting in $500,000 damage to each building and its contents.[2]

Bor-Son was the principal named in the performance bond and Commercial Union was the surety. Thus, Bor-Son had the obligation to defend the suits, insofar as they alleged claims against the surety on the performance bonds, and to indemnify the surety, Commercial Union, for any amounts it might have to pay because of those suits. On the other hand, by the terms of the comprehensive general liability insurance policy, Commercial Union had the obligation to provide Bor-Son with a defense of any claims asserted against Bor-

Son within the coverage of the policy and to pay any claims ultimately determined to be within the policy coverage.

On May 2, 1975, an attorney for Bor-Son wrote a letter to Commercial Union informing Commercial Union that that firm would interpose an answer on behalf of Commercial Union in the two pending HRA actions and agreed that Bor-Son would hold Commercial Union "harmless" insofar as the HRA had any claim against the surety on the bonds furnished by Bor-Son. In that letter, the attorney indicated that the "hold harmless" agreement did not apply insofar as any of the damages alleged or proved by the HRA turned out to be within the coverage of the comprehensive general liability insurance policies issued to Bor-Son by Commercial Union.

The underlying HRA lawsuits lay dormant for several years during which the various parties were trying to correct the water infiltration problem. During that period of dormancy, the attorney for Bor-Son and the claim department of Commercial Union kept in periodic contact with status inquiries and status reports. Also during this period of time, Commercial Union and, apparently, the then attorney for Bor-Son considered that Commercial Union's only responsibility under the comprehensive general liability insurance policy arose out of only one allegation in each complaint suggesting that HRA claimed damage to contents of the buildings.[3] Though Commercial Union requested the nature and extent of any such property contents damage, it never received any response from Bor-Son or its attorneys.

In late 1979, the two HRA lawsuits became "active" again and depositions were taken. Following the depositions, HRA demanded in settlement more than $2 million

---

**2.** These complaints were later amended alleging $1.5 million in damages for each building. Also, the suits were later consolidated.

**3.** The only reference to HRA's claimed damages other than for faulty workmanship and materials provided by Bor-Son to Commercial Union's attorney covered by the performance bond was Paragraph 8 of the complaint, to-wit:

That by reason of the faulty materials and workmanship of defendants, plaintiff will incur expense in remedying such conditions and has suffered damage to said buildings *and its contents* in the amount of * * *. (emphasis added)

in damages. After a series of negotiations, HRA agreed to accept $450,000 in settlement of the two cases from the various defendants and third-party defendants. Bor-Son contributed $100,750 to the settlement. In connection with the settlement negotiations, in the late summer of 1980 HRA submitted a long list of claimed damages. This list contained no claim for "damage to contents." It did, however, for the first time, assert a claim for loss of rents and relocation costs HRA claimed to have sustained as the result of the water infiltration problem and the attempts to correct it.[4] The settlement of the HRA lawsuits made no allocation of amounts of money toward the various damage claims which had been asserted by HRA during the negotiations.

After contributing to the settlement, Bor-Son commenced this declaratory judgment action seeking indemnification from Commercial Union for its contribution to HRA's case settlement and its attorneys fees in that action, as well as in this action, claiming that Commercial Union, as insurer on the comprehensive general liability insurance policy, had the duty to defend and to indemnify it in the HRA actions. The trial court held that under the comprehensive general liability insurance policy, (1) Commercial Union had the duty to defend Bor-Son in the HRA action because the allegations in the complaints in that action alleged water penetration due to faulty construction; (2) that the faulty construction and resulting water penetration constituted an "occurrence" as that word is used in the comprehensive general liability insurance policy; (3) that none of the exclusionary clauses in the policy were applicable to relieve Commercial Union of its policy duties to defend and indemnify Bor-Son; and (4) that Bor-Son's coverage under the comprehensive general liability insurance policy was not "abrogated or limited" because

Commercial Union had furnished a performance bond. The trial court then ordered judgment be entered awarding Bor-Son indemnity for the entire $100,750 it had paid toward the HRA settlement plus attorneys fees in the HRA actions as well as in this declaratory judgment action.

Appellant Commercial Union claimed in the trial court, and here, that the HRA suits against Bor-Son were based upon the contract documents and, with the possible exception of the allegation in the complaint of damage to contents which all parties concede was subsequently abandoned by HRA, alleged damages to the two apartment buildings as a result of Bor-Son's breach of contract in furnishing defective workmanship and materials. Commercial Union asserts that damages to the buildings themselves flow from faulty construction—a breach of the contract—and, therefore, are recoverable only from the contractor, Bor-Son, or in the case of default by the principal, from its surety on the performance bonds.

■ When it entered into the contracts, Bor-Son assumed certain business risks. Included in those risks was the obligation to construct buildings free from defects and to remedy, on demand, any defects discovered within a year of completion. Moreover, since these were federal contracts, Bor-Son was "fully responsible for all development and construction." HUD Low Income Housing Regulations, 24 C.F.R. § 841.201 (1980) (current version at 24 C.F.R. § 841.-102(b) (1981)).[5] Any damages to the buildings sustained by HRA because of defective workmanship or materials flowed from the contract documents and the obligations Bor-Son undertook therein. To protect the owner, HRA, from loss resulting from building damage, Bor-Son was required to furnish a performance bond. To protect those who sustained damage to person or

---

4. This claim emerged just a few weeks before the settlement was consummated. There is no evidence that the existence of this emergent claim was communicated to Commercial Union prior to the settlement.

5. Although Bor-Son was required to assume those risks, it attempted to pass the risk to its subcontractors. Each subcontract provided for indemnity to Bor-Son for any financial exposure to HRA by Bor-Son because of poor workmanship or materials.

property—other than for damages to buildings which were the subject matter of the contract—Bor-Son was required to carry comprehensive general liability insurance. The distinction between a performance bond and a comprehensive general liability insurance policy, in our view, is crucial to the resolution of the issues of this case. The allegations in the HRA complaints concern faulty workmanship and materials resulting in damage to the buildings themselves. These allegations, if proved, were damages arising from a breach of contract whether the acts or omissions giving rise to the claims were negligent or intentional. Since the alleged building damages were the result of alleged breach of contract, there was no duty on Commercial Union, the comprehensive general liability insurer, to defend the HRA actions nor to indemnify Bor-Son for its contribution toward the settlement of those actions.[6]

■ The trial court opined that the claims of HRA "sounded in negligence" and that the faulty construction and water penetration of the apartment buildings constituted an "occurrence" as that term was used in the comprehensive general liability insurance policy. In so holding, the trial court relied on *Bituminous Casualty Corp. v. Bartlett*, 307 Minn. 72, 240 N.W.2d 310 (1976), and *Ohio Casualty Insurance Co. v. Terrace Enterprises, Inc.*, 260 N.W.2d 450 (Minn.1977). In *Bartlett*, the court held that where a subcontractor used defective brick and erected a building wall "out of plumb" there was no "occurrence" within the meaning of a comprehensive general liability insurance policy because the policy defined "occurrence" as an "accident." 307 Minn. at 76–8, 240 N.W.2d at 312–13. The court there reasoned that where the subcontractor intentionally performed defective work, there was no "accident" and accordingly no coverage afforded the subcontractor by the insurer on the general liability

insurance policy. *Id.* at 79–80, 240 N.W.2d at 314. The court so held essentially because a central concept of insurance is violated when a single insured is allowed through intentional and reckless acts to control the risks covered by the policy. *Id.* at 78, 240 N.W.2d at 313. Apparently, the basic question of whether a comprehensive general liability insurance policy could be changed into a performance bond, assuring that work and materials would be furnished pursuant to the contract, was not raised in *Bartlett*; nor was the question raised as to whether the damaged property was within the exclusive care and control of the insured, although the facts indicate that it was not.

In *Ohio Casualty*, Terrace Enterprises contracted with Doerfler Construction to construct two apartment buildings. Doerfler retained the excavation and carpentry work and subcontracted the rest of the "job" to 15 subcontractors. A soil testing laboratory recommended that the project be stopped until the soil conditions improved for the laying of footings and the foundation and specifically warned Doerfler Construction of the need to protect the soil and concrete from freezing and of the danger of backfilling over frozen soil. Notwithstanding the warning, Doerfler Construction proceeded with the work. It made some efforts to protect the soil and concrete from climatic conditions, but its efforts were inadequate. As a result, the building settled and threatened to collapse, and it was necessary to lift the building on jacks and replace the foundations. Terrace Enterprises sued Doerfler Construction to recover expenses it incurred (1) in rectifying the faulty construction, and (2) for losses it sustained—rental income—which were occasioned by delay in the building completion. Doerfler Construction tendered the defense of that suit to its general liability insurer, which denied the tender. Appar-

---

**6.** The "loss of rental" and "relocation cost" claims surfaced only a few weeks before the settlement. Since those alleged damages were not to the buildings themselves, those claims might well be "covered" by Commercial Union's comprehensive general liability insurance policy. *See* discussion, *infra*.

ently, suit was not brought on the performance bond, if there was one.[7]

We held in *Ohio Casualty* that there was coverage insuring Doerfler Construction against the claim because (1) the damaged property was realty and Doerfler Construction's work was only in connection with a specific item so as not to constitute "care, custody and control" of the surrounding area; (2) the apartment complex was built on another's land; and (3) because there was a dispute whether Doerfler Construction or Virgil Doerfler personally and individually was the general contractor—and no finding by the trial court on the issue—we considered Doerfler Construction did not have "care, custody and control." 260 N.W.2d at 453–54. The facts in *Ohio Casualty* differ in several respects from the case at bar. Here, the apartment buildings were built on land which, in reality, was owned by Bor-Son.[8] Moreover, Bor-Son was in control of the entire project on both buildings; it reserved no specific work for itself and damages sustained by HRA were, unlike those in *Ohio Casualty*, not the result of Bor-Son's work on a specific item but rather because of a breach of its contract duty to provide buildings free from faulty workmanship and materials. Finally, it is clear from the contract documents, unlike the situation in *Ohio Casualty*, that Bor-Son was the general contractor and was fully responsible to HRA for all construction on the two projects.[9]

It is clear that all the damages claimed by HRA arose out of Bor-Son's breach of contract. HRA had not received the product—the buildings—for which it had bargained. Its damages resulted from faulty workmanship in the performance of the contracts. This liability on the part of the contractor is not within the coverage of the contractor's general liability policy. *See* Henderson, *Insurance Protection for Products Liability and Completed Operations—What Every Lawyer Should Know*, 50 Neb.L.Rev. 415, 441 (1971):

> The risk intended to be insured is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the product or completed work itself, and for which the insured may be found liable. The insured, as a source of goods or services, may be liable as a matter of contract law to make good on products or work which is defective or otherwise unsuitable because it is lacking in some capacity. This may even extend to an obligation to completely replace or rebuild the deficient product or work. This liability, however, is not what the coverages in question are designed to protect against. The coverage is for tort liability for physical damage to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained.

In *Weedo v. Stone-E-Brick, Inc.*, 81 N.J. 233, 405 A.2d 788 (1979), the New Jersey court, after referring to Henderson, said:

> Whether the liability of the businessman is predicated upon warranty theory or, preferably and more accurately, upon tort concepts, injury to persons and damage to

7. Probably the claim was not asserted because Terrace Enterprises and Doerfler Construction were corporations solely owned and controlled by Virgil Doerfler. If suit had been brought against Doerfler Construction on the contract, in effect, if not in law, Doerfler would be suing himself since Doerfler Construction would be the principal on any performance bond.

8. As previously indicated, HRA ultimately provided the interim financing because it could do so at a lower rate of interest, but the land was still acquired by the contractor and was under its control throughout construction.

9. In claims alleging damages to real property on which the insured contractor is working, resolution of the issue of whether the contractor has "exclusive care and control" is facilitated by checking the contract documents to see if a stipulation appears therein as to which party has control of the property. If the contract documents allocate responsibility and control, the courts will enforce such allocation. Mustachio, *Manufacturers and Contractors Liability Insurance Policy: The Care, Custody or Control Exclusion Clause*, 6 Hous.L.Rev. 359, 364 (1968).

other property constitute the risks intended to be covered under the CGL. *Id.* at 240–41, 405 A.2d at 792. It then went on to explain that a contractor undertakes two kinds of risks, saying:

> The insured-contractor can take pains to control the quality of the goods and services supplied. At the same time he undertakes the risk that he may fail in this endeavor and thereby incur contractual liability whether express or implied. The consequence of not performing well is part of every business venture; the replacement or repair of faulty goods and works is a business expense, to be borne by the insured-contractor in order to satisfy customers.

*Id.* at 239, 405 A.2d at 791. That court then went on to contrast the category of risks covered by the comprehensive general liability insurance policy, saying:

> There exists another form of risk in the insured-contractor's line of work, that is, injury to people and damage to property caused by faulty workmanship. Unlike business risks of the sort described above, where the tradesman commonly absorbs the costs attendant upon the repair of his faulty work, the accidental injury to property or persons substantially caused by his unworkmanlike performance exposes the contractor to almost limitless liabilities. While it may be true that the same neglectful craftsmanship can be the cause of both a business expense of repair and a loss represented by damage to persons and property, the two consequences are vastly different in relation to sharing the cost of such risks as a matter of insurance underwriting.

*Id.* at 239–40, 405 A.2d at 791. In a case similar to the case at bar, the court held:

> We are convinced that the standard comprehensive general liability policy does not provide coverage to an insured-contractor for a breach of contract action grounded upon faulty workmanship or

materials, where the damages claimed are the cost of correcting the work itself. *Vernon Williams & Son Construction, Inc. v. Continental Insurance Co.*, 591 S.W.2d 760, 765 (Tenn.1979).

Just prior to the settlement between HRA, Bor-Son and other parties in the late summer of 1980, for the first time HRA asserted a claim for loss of rents. The ensuing settlement, however, failed to allocate monies on the various claims that had been presented to the defendants and their insurers just prior to that settlement. This claim for loss of rentals had never been asserted in any pleadings in the lawsuit. Had it been asserted, it would have constituted a damage claim that was covered by Bor-Son's comprehensive general liability insurance policy. *Ohio Casualty Insurance Co. v. Terrace Enterprises, Inc.*, 260 N.W.2d 450 (Minn.1977). But since it was not asserted in the complaints or amended complaints, there was no duty on Commercial Union to defend Bor-Son against that claim.[10] Moreover, since there was no allocation of damage monies that HRA received from the settling defendants that would establish the amount Bor-Son paid toward the settlement of that loss of rental claim, and since Bor-Son, in this case, furnished no evidence to establish that fact, Bor-Son failed to meet its burden of proving its claim for reimbursement.

Reversed.

---

**10.** Apparently Commercial Union never knew of the existence of this claim prior to the settle- ment.