MAGNETIC DATA, INC., Respondent,

v.

ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Appellant.

No. C7-88-823.

Court of Appeals of Minnesota.

Oct. 18, 1988.

Review Granted Dec. 21, 1988.

Philip A. Pfaffly, Gregory D. Peterson, Moss & Barnett, Minneapolis, for respondent.

Timothy P. Tobin, Beverly J. Babcock, Gislason, Dosland, Hunter & Malecki, Minnetonka, for appellant.

Heard, considered and decided by KALITOWSKI, P.J., and NIERENGARTEN and HACHEY,* JJ.

## OPINION

NIERENGARTEN, Judge.

This is an appeal from summary judgment declaring the appellant insurance company responsible for indemnifying and defending its insured against claims by the insured's customer. We affirm.

## FACTS

The respondent Magnetic Data Inc. (MDI) is a computer company whose principal business is inspecting and repairing computer disk cartridges. A computer disk cartridge comprises a protective plastic molding and a disk platter upon which data can be magnetically encoded and stored. A disk cartridge can be inspected for defects by visual inspection, gauge measurement, or electronic inspection. The electronic inspection process necessarily erases all data encoded on the disk. A disk cartridge is "certified" when the cartridge is inspected by all three processes and no defects are found.

In February 1984, the Sanger Corporation (Sanger) arranged with Control Data Corporation (Control Data) to have MDI inspect twenty-two computer disk cartridges for defects. Ten of the cartridges contained information that had been fully backed up (i.e., copied or transferred to other sources). The remaining twelve cartridges (the critical cartridges) were not backed up; the critical cartridges were supposed to be visually inspected and gauge tested only, and were not to be certified. In early March 1984, the cartridges were

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

delivered to MDI by a Control Data employee. For reasons not evident in the record, MDI employees certified all twenty-two cartridges consequently erasing valuable client information from Sanger's critical disk cartridges. According to the parties' stipulation to facts, MDI's employees "specifically intended to certify the twelve critical disk cartridges" and knew certification would result in erasure of the data magnetically encoded on the cartridge disks.

Sanger sued MDI and Control Data asserting it incurred damages as a result of the erasures. MDI tendered defense of the suit to its insurer, St. Paul Fire and Marine Insurance Company (St. Paul Fire), claiming the damages were covered under a comprehensive general liability (CGL) policy which MDI purchased from the appellant St. Paul Fire. St. Paul Fire refused to defend the suit claiming the losses were not covered under the policy. MDI commenced an action for a declaratory judgment on the coverage issue.

St. Paul Fire contended the CGL policy did not cover the damages resulting from the loss of the computer data because the destroyed information was not "tangible" property and the erasure was neither an "accidental event" nor an "occurrence" under the terms of the insurance policy. St. Paul Fire also contended the standard CGL policy exclusions excluded coverage for losses resulting from damage to property under MDI's control or arising out of damage to MDI's products or work.

According to the CGL policy, the insurance agreement was intended to protect against two kinds of liability claims: (1) "Claims resulting from bodily injury to others," and (2) "Claims resulting from damage to other people's property."

> This agreement covers the type of claim—Bodily Injury or Property Damage—for which a limit is shown in the Coverage Summary. We'll pay amounts you and others protected under this agreement are legally required to pay as damages for a covered bodily or property

damage claim resulting from an accidental event.

\* \* \* \* \* \*

*Property damage* means any damage to tangible property of others that happens while this agreement is in effect. This includes loss of use of the damaged property resulting from the damage. Property damage also includes loss of use of others' property that hasn't been physically damaged if caused by an accidental event that happens while this agreement is in effect.

\* \* \* \* \* \*

*Accidental event* means any event that results in bodily injury or property damage that the protected person didn't expect or intend to happen.

The CGL policy and a broadening endorsement issued to MDI contain several exclusions which limit the coverage of the insurance policy.

**Business risk.** We won't cover loss of use of tangible property that hasn't been physically damaged when the loss of use is caused by your failure to live up to a contract or by the failure of your products or work to live up to your promises. But we will cover loss of use of tangible property of others that's caused by sudden or accidental damage or destruction of your products or work after they've been used by another person.

\* \* \* \* \* \*

Damage to your products or work. We won't cover damage to any of your products caused by the product itself or by any of its parts. \* \* \* Nor will we cover damage to your work that's caused by the work itself or by materials or equipment connected with it.

\* \* \* \* \* \*

Control of property. We won't cover damage to any of the following:

\* \* \* \* \* \*

4. Property on your premises or premises of any other protected person for the purpose of being worked on by you or on your behalf.

Both parties moved for summary judgment on the coverage issue. The district court granted summary judgment in favor of MDI, and ordered St. Paul Fire to defend MDI against Sanger's claims in the underlying action and "indemnify [MDI] against any and all damages awarded to the Sanger Corporation as a result of its loss of use of the data erased from the computer disk cartridges inspected and repaired by [MDI]." The court also ordered St. Paul Fire to reimburse MDI $22,094.25 for costs and attorney fees incurred in defending the underlying liability action and in prosecuting the declaratory judgment action. St. Paul Fire appeals from the summary judgment.

## ISSUE

Did the district court err by granting summary judgment in favor of the respondent?

## ANALYSIS

Upon proper motion by a party, the district court shall render summary judgment

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law.

Minn.R.Civ.P. 56.03.

The underlying facts are not contested. The parties dispute only the district court's interpretation of the insurance policy language and the court's application of the law. Accordingly, this court must determine whether the district court "properly interpreted and applied the law to the facts." *See Associated Independent Dealers, Inc. v. Mutual Service Insurance Cos.*, 304 Minn. 179, 183–84, 229 N.W.2d 516, 519 (1975).

> In the interpretation of insurance contracts, as with any other contract, we start with the principles that the parties are free to contract as they see fit and that the language of the contract is to be given its plain and ordinary meaning. However, it is equally true that the terms of a contract must be read in the context of the entire contract, and the terms will not be so strictly construed as to lead to a harsh and absurd result.

*Employers Mutual Liability Insurance Co. v. Eagles Lodge of Hallock*, 282 Minn. 477, 479–80, 165 N.W.2d 554, 556 (1969) (citations omitted).

### "Accidental Event"

■ Both parties agree MDI's employees specifically intended to certify the cartridge disks and knew full certification "would result in the erasure of the data magnetically encoded on the disks." The parties also agree MDI's employees "expected and intended" the data encoded on the magnetic disk would be erased. St. Paul Fire contends damages resulting from the erasure are not covered by the CGL policy because the policy does not cover events which are "expected" or "intended" by the insured. MDI asserts that the MDI employees did not specifically intend to cause consequential damages to Sanger and its clients.

> Accident, as a source and cause of damage to property, within the terms of an accident policy, is an unexpected, unforeseen, or undesigned happening or consequence from either a known or an unknown cause.

*Hauenstein v. St. Paul–Mercury Indemnity Co.*, 242 Minn. 354, 358–59, 65 N.W.2d 122, 126 (1954) (footnote omitted).

MDI's employees inspecting Sanger's disk cartridges apparently did not know or realize the critical cartridges were not supposed to be electronically inspected. The actual certification process apparently was performed according to industry standards and the record before this court does not contain any evidence indicating the employees performing the certification processes expected or should have expected their actions would result in damages to Sanger and its clients. This case is unlike *Bituminous Casualty Corp. v. Bartlett*, 307 Minn. 72, 240 N.W.2d 310 (1976), *overruled on other grounds, Prahm v. Rupp Construction Co.*, 277 N.W.2d 389 (Minn.1979), wherein a construction contractor knowing-

ly used inferior brick and intentionally installed out-of-plumb walls "contrary to contract standards of workmanship," and therefore should have expected any resulting property damage. *See Bartlett,* 307 Minn. at 79, 240 N.W.2d at 313–14.

We believe the certification of the twelve critical cartridges was an "accidental event" within the meaning of MDI's CGL policy because the loss of Sanger's data on the critical cartridges was "an unexpected, unforeseen, or undesigned happening or consequence." *See Hauenstein,* 242 Minn. at 358, 65 N.W.2d at 126. The record does not indicate MDI's employees realized the erasure would result in loss of unduplicated information. While the technical task of erasing the data from the disks was performed intentionally, the certification process itself was accidentally or mistakenly performed, and the loss of the computer data was the type of accidental loss intended to be covered by MDI's CGL policy. *See Bartlett,* 307 Minn. at 78, 240 N.W.2d at 313 (the liability policy was designed to protect the insured from "fortuitous losses" occurring in connection with the insured's work; "If property damage occurs because of mistake or carelessness on the part of the contractor or his employees, [the contractor] reasonably expects that damage to be covered."); *see also Larsen v. General Casualty Co. of Wisconsin,* 99 F.Supp. 300, 302 (D.Minn.1951), *aff'd,* 196 F.2d 170 (8th Cir.1952) (the negligence of the insured's employee "accidentally" caused the damage; the "occurrence or mishap unintentionally caused" was an "accident" within the "plain intendment of the policy"). Finally, coverage of Sanger's consequential damages does not violate fundamental insurance concepts because, under the circumstances, we do not believe erasure of the information stored in the critical cartridges constituted an intentional or reckless act by which MDI sought to "consciously control the risks covered by the policy." *See Bartlett,* 307 Minn. at 78, 240 N.W.2d at 313.

We conclude the erasure of the data on the critical cartridges was an "accidental event" within the meaning of the CGL policy. Accordingly, we must determine whether coverage of Sanger's consequential damages is excluded by other provisions in MDI's insurance policy.

#### *"Tangible Property"*

■ The parties dispute whether the erasure of the magnetically encoded data resulted in damage to "tangible" property. MDI states "it is the information stored on the disk cartridges which is of value to MDI's customers" and contends erasure of the information caused rearrangement of the subatomic particles on the cartridge disks. MDI submitted affidavits from two computer experts who suggest the subatomic particles on the surface of a magnetic disk are tangible property. St. Paul Fire claims erasure did not result in damage to tangible property and asserts the CGL policy does not cover any loss unless some damage to "tangible" property occurs.

Although the policy defines "property damage" as "any damage to tangible property of others," insurance coverage is not necessarily limited to tangible property damage because the CGL policy further provides:

> Property damage also includes loss of use of *others' property* that hasn't been physically damaged if caused by an accidental event that happens while this agreement is in effect.

(emphasis added). The insurance policy defines an "accidental event" as "any event that results in * * * *property damage* that the protected person didn't expect or intend to happen." (emphasis added).

By its own terms, the policy does not limit coverage to claims arising from damage to tangible property. So long as an accidental event occurred which resulted in unexpected or unintended "property damage," including "loss of use of others' property that hasn't been physically damaged," the property damage is covered unless it is otherwise excluded by the policy. Even if magnetically encoded computer data is not tangible property, the computer information encoded on the critical cartridge disks was property of Sanger and its clients. *Cf. Fingerhut Products Co. v. Commissioner*

*of Revenue,* 258 N.W.2d 606, 610 (Minn. 1977) (the court characterized marketing "information" as "intangible property"). Since the computer information encoded on the critical cartridge disks was property and was unexpectedly or unintentionally destroyed during the certification process, Sanger's loss of use of that property constitutes "property damage" within the meaning of MDI's CGL policy because the erasure was "caused by an accidental event." It is immaterial whether any tangible property was damaged. It also is immaterial whether the computer data itself is tangible or intangible property because, under the specific language in MDI's CGL policy, loss of use of property is covered even if the property "hasn't been physically damaged" if the damage was "caused by an accidental event." Accordingly, coverage of Sanger's loss-of-use claim against MDI is not excluded by the terms of the CGL policy.

### Care, Custody or Control

■ The CGL policy and its broadening endorsement exclude coverage of damage to "[p]roperty on [MDI's] premises * * * *for the purposes of being worked on* by [MDI] or on [MDI's] behalf." (emphasis added). The CGL policy exclusion is analogous to a typical care, custody or control exclusion. In determining whether MDI was exercising care, custody or control within the meaning of its CGL policy, we examine the facts of this case in light of the following three factors:

(1) Whether the property is realty or personalty;
(2) the location, size, shape, and other characteristics of the property; and (3) the insured's duties with respect to the property as a whole, the property damaged, and other workers.

*Ohio Casualty Insurance Co. v. Terrace Enterprises, Inc.,* 260 N.W.2d 450, 453 (Minn.1977) (footnote omitted).

Since the damaged property in this case was personalty rather than realty, this factor does not necessarily favor coverage. *See id.* at 453 (the damaged property was realty, "a factor favoring coverage").

In analyzing the facts under the second factor, we distinguish between the physical components of the disk cartridges and the information encoded on the cartridge disks. Even though the parties have stipulated that the disk cartridges were "located at the business premises of MDI" and that the "disk cartridges were certified while in the care, custody and control of MDI," we do not believe coverage necessarily is precluded under the care, custody or control exclusion because the damaged property—Sanger's computer information—was not on MDI's premises "for the purposes of being worked on." Sanger suspected certain computer disk cartridges were defective and that the cartridges may have caused Sanger's computer system to malfunction. However, there is no evidence in the record indicating the information encoded on the magnetic disks was the source of the suspected defects; nor is there any indication in the record that MDI was authorized or expected to perform any inspection processes that would affect Sanger's computer information.

Our distinction between the physical computer disk cartridges and the magnetically encoded information stored on the disks may be technical because the computer disks and the magnetically encoded information contained on those disks are intimately related. However, we do not believe the distinction is artificial given the unique characteristics of the property involved. Sanger's information apparently was readily transferable and could have existed independent of the specific disks upon which it was encoded, and its existence on the critical cartridge disks apparently was fortuitous. Sanger's expectations about the type of work which would be performed on the critical cartridges also supports our conclusion that the disk cartridges and the information encoded on the disks were separate property. Sanger authorized only visual inspection and gauge testing of the critical cartridges and did not authorize electronic inspection because that process necessarily would erase unduplicated information stored in the critical cartridges. We only can conclude therefore that while the critical cartridges were on

MDI's premises for the purposes of being worked on, the information encoded on the critical cartridge disks was separate property and not on MDI's premises for the purposes of being worked on.

The third factor also is conclusive and favors coverage. MDI did not exercise sole control over the disk cartridges or the magnetically encoded data. Sanger approached Control Data about its computer problems and informed Control Data that twelve of the twenty-two disk cartridges were not backed up and should not be certified. The record indicates Control Data arranged with MDI for inspection of Sanger's disk cartridges. The record also indicates that the Control Data employee who delivered the critical cartridges to MDI "may or may not have instructed MDI personnel that these critical cartridges were to be visual and gauge tested only." Direct communication with Sanger about the details and the extent of the inspection process was an essential element of the inspection work; that portion of the project was performed by persons not under MDI's supervision or control.

Since MDI was not authorized to perform inspection processes which would affect the information magnetically encoded on the cartridge disks and its control over other workers involved in essential elements of the inspection project was limited, the property damaged was not in MDI's care, custody or control within the meaning of its CGL insurance policy.

### Work Products Exclusion

■ According to the broadening endorsement, the CGL policy does not cover "damage to any of [MDI's] products caused by the product itself or by any of its parts." The policy also does not cover "damage to [MDI's] work that's caused by the work itself or by materials or equipment connected with it." The CGL policy further states it will not cover certain business risks. MDI asserts the work product exclusion does not apply because the damages were not caused by MDI's "shoddy workmanship," but resulted from "a mistaken assumption as to what work its customer wanted performed."

The work product and business risk exclusions in the CGL policy exclude coverage of damages arising from MDI's breach of contract and damages resulting from "faulty workmanship in the performance of the contracts." *See Bor–Son Building Corp. v. Employers Commercial Union Insurance Co. of America*, 323 N.W.2d 58, 63 (Minn.1982); *see also T.E. Ibberson Co. v. American & Foreign Insurance Co.*, 346 N.W.2d 659, 661 (Minn.Ct.App.1984) (work product exclusions are intended to deny coverage of damages resulting from the insured's own negligence).

"The risk intended to be insured is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the product or completed work itself, and for which the insured may be found liable."

*Bor–Son*, 323 N.W.2d at 63 (quoting Henderson, *Insurance Protection for Products Liability and Completed Operations—What Every Lawyer Should Know*, 50 Neb.L.Rev. 415, 441 (1971)).

The record does not contain any evidence that the quality of MDI's work in certifying the critical cartridges was substandard and there is no evidence that MDI's product itself, i.e., the inspection and certification of the disk cartridges, was damaged. Sanger's loss-of-use claims are based on MDI's accidental or mistaken certification of Sanger's disk cartridges and are distinguishable from the kinds of damages which arise out of contractual business risks typically excluded under work product and business risk exclusion provisions. *See Knutson Construction Co. v. St. Paul Fire & Marine Insurance Co.*, 396 N.W.2d 229, 234 (Minn.1986) (an insurer does not assume contractual business risks "because it has no effective control over those risks and cannot establish predictable and affordable insurance rates"). We conclude Sanger's loss-of-use damages are the kind of third party damages the CGL policy was intended to cover.

This court cannot construe the CGL policy so strictly in favor of St. Paul Fire as to absolve the insurer of all liability; nor can we construe the insurance policy so strictly against St. Paul Fire as to create a new insurance contract imposing additional liabilities on the insurer. *See Employers Mutual Liability Insurance Co. v. Eagles Lodge of Hallock*, 282 Minn. 477, 480, 165 N.W.2d 554, 556 (1969). However, "[i]n construing an insurance policy, the paramount question is what hazards the parties intended to cover." *Employers Mutual Casualty Co. v. Kangas*, 310 Minn. 171, 174, 245 N.W.2d 873, 875 (1976). MDI is a computer company engaged primarily in the business of inspecting and repairing computer disk cartridges. The parties concede the actual value of a disk cartridge is negligible, and it is evident from the record that one of MDI's primary insurable risks is consequential loss of information and third parties' inability to store, copy and transfer computer data because of MDI's mistaken or accidental conduct in inspecting or repairing disk cartridges. Given the nature of MDI's business and the unique circumstances of this case, we conclude the loss of information on Sanger's cartridge disks was a hazard MDI and St. Paul Fire intended the CGL policy to cover. Accordingly, we affirm the district court which ordered St. Paul Fire to defend MDI against Sanger's claims in the underlying action and indemnify MDI for damages awarded to Sanger as a result of the loss of use of Sanger's computer data.

## DECISION

MDI's comprehensive general liability insurance policy covers Sanger's loss-of-use claims because the erasure of Sanger's computer information constitutes "property damage" which was "caused by an accidental event." The property damage is not excluded under the care, custody or control exclusion because Sanger's computer information was not on MDI's premises "for the purposes of being worked on" by MDI. Sanger's loss-of-use claims also are not excluded under the work product or business risk exclusions because Sanger's property damages are the kind of third party proper-

ty damages the CGL policy was intended to cover.

The district court's summary judgment in MDI's favor, including its judgment for attorney fees and costs incurred in the underlying actions, is affirmed.

Affirmed.