**St. Paul Fire & Marine Insurance Company v. The Bergquist Company**

*Ronald Hamilton,* for plaintiff.
*Thomas M. Kittredge,* for defendant.

LORD, *J.,* February 8, 1996—

## I. INTRODUCTION

In this declaratory judgment action, St. Paul Marine and Fire Insurance Company sought a determination from this court that it is not obligated to indemnify The Bergquist Company, who was St. Paul's insured pursuant to a commercial general liability insurance policy, with respect to certain claims made by the Sunroc Corporation against Bergquist. Both St. Paul and

Bergquist filed motions for summary judgment with this court. Both St. Paul and Bergquist agreed that no genuine issues of material fact were in dispute, and on February 15, 1995, this court resolved the indemnification issue in favor of St. Paul and entered summary judgment in favor of St. Paul. Bergquist has now appealed, contending in its statement of matters complained of on appeal that this court's finding in favor of St. Paul was erroneous.

## II. THE ARBITRATION

The declaratory judgment action before this court arose out of an American Arbitration Association arbitration proceeding which was commenced against Bergquist by Sunroc on June 20, 1990. Sunroc was engaged in the manufacture and sale of hot/cold water dispensers, and Sunroc had purchased from Bergquist rubberized heat transfer tape known as "Q-Pad II" for use in its water coolers. In its demand for arbitration, Sunroc alleged that Bergquist had breached its contracts with respect to the Q-Pad II, and breached warranties with respect to the Q-Pad II. The basis for Sunroc's claim was that the Q-Pad II in certain Sunroc coolers emitted a highly offensive odor when it was heated during ordinary use of the Sunroc coolers. The odor was variously described by Sunroc employees as a "sulphur or rotten egg type smell" (deposition of Leon Park, p. 9, exhibit D to St. Paul supplemental memo), or "like rotting fish," (deposition of Daniel McShane, p. 49, exhibit A to St. Paul supplemental memo), and as strong enough to "clear a building." *(Id.,* p. 48.) Sunroc determined that older batches of Q-Pad II used in Sunroc coolers did not emit an odor, while more recent batches of the product gave off the foul odor. Sunroc then contacted Bergquist and found out that

Bergquist had changed the adhesive which it used in manufacturing the Q-Pad II. Sunroc had not been previously advised by Bergquist as to the change in the adhesive. In the arbitration, Sunroc asserted that as a result of the foul odor emanating from the Q-Pad II, Sunroc and certain of its customers had to rework Sunroc's coolers to replace the offending Q-Pad II heat transfer tape. Sunroc also alleged that it suffered a substantial loss of profits when Sunroc's major customer, the Perrier Group, cancelled their planned purchase of over 18,000 of Sunroc's hot/cold water dispensers as a result of their concerns about the odor which the Q-Pad II tape produced. Sunroc sought damages for "[r]eworking already manufactured product to replace defective goods" and for "lost profits." (Sunroc demand for arbitration, St. Paul S.J., exhibit "E".)

The arbitration was conducted from January 15, 1991, through February 1, 1991, before arbitrator William H. Brown, III. St. Paul defended Bergquist in the arbitration, but with a reservation of St. Paul's rights and defenses in connection with the issue of indemnification. At the conclusion of the arbitration, the arbitrator found in favor of Sunroc against Bergquist and awarded damages to Sunroc in the amount of $618,879.41. The damages, as itemized by the arbitrator, consisted of $579,517.60 for Sunroc's lost profits and $39,361.81 to compensate Sunroc for its costs of reworking certain coolers to replace the Q-Pad II which would emit the offensive odor. The arbitrator did not issue any findings of fact or conclusions of law in support of his award.

At some time after the arbitrator had entered his award, Sunroc agreed to settle its claim against Bergquist for $360,000. Bergquist and St. Paul each paid $180,000 to Sunroc to effectuate the settlement, but Bergquist

and St. Paul reserved their rights against each other with regard to whether or not Bergquist was entitled to be indemnified by St. Paul.

## III. THE STIPULATIONS OF THE PARTIES

For purposes of this declaratory judgment action and their respective motions for summary judgment which were pending before this court, St. Paul and Bergquist entered into the following stipulations: First, that there were no genuine issues of material fact, and that resolution of their dispute required this court to decide a matter of law only. (N.T. 3-4.)[1] Second, since other judges of this court had previously denied motions for summary judgment filed on behalf of both parties, the parties agreed that they would not assert that this court erred by reconsidering the orders of other judges. Third, the parties agreed that the insurance policy in question is to be construed in accordance with Minnesota law. And fourth, the parties agreed that this court would resolve their dispute by entering judgment in the amount of $180,000 in favor of whichever of St. Paul or Bergquist prevailed on the indemnification issue.

## IV. THE INSURANCE POLICY

The parties agree that to resolve their dispute this court must construe St. Paul's insurance policy no. TE06300343 issued to Bergquist, the policy, and particularly the section of the policy entitled "Commercial General Liability Protection (Form 43500)", CGL form. St. Paul argues that Sunroc's claims against Bergquist are excluded from the coverage of the policy by two

---

1. In this opinion, the notes of testimony of the argument on the parties' motions for summary judgment held January 25, 1995, will be referred to as "N.T." followed by a page reference.

exclusions contained therein—the "impaired property exclusion" and the "product recall exclusion." Bergquist asserts that these exclusions are not applicable to Sunroc's claims. I find that either of these exclusions is sufficient to eliminate Sunroc's claims against Bergquist from the policy's coverage.

## V. APPLICABLE MINNESOTA LAW

The parties have brought to this court's attention several principles for construing insurance policies established by Minnesota law. Pursuant to Minnesota law, insurance policies are similar to other contracts. "The policy is a matter of agreement between the parties, and a court's function is to determine what the parties' agreement was and to enforce it." *Grossman v. American Family Mutual Insurance Company,* 461 N.W.2d 489, 493 (Minn. App. 1990). In construing an insurance policy, words should be given their ordinary and generally understood meaning. *West Bend Mutual Insurance Company v. Milwaukee Mutual Insurance Company,* 384 N.W.2d 877, 880 (Minn. 1986). Any ambiguities in the policy, particularly in exclusions from coverage, are to be strictly interpreted against the insurer. *Bob Useldinger & Sons Inc. v. Hangsleben,* 505 N.W.2d 323, 327 (Minn. 1993). "However, a court may not read an ambiguity into the plain language of a policy in order to create coverage where none otherwise exists." *Grossman, supra* at 493. As will be explained in detail hereinafter, in construing the clauses of the policy which are at issue in this case, I found no ambiguity in their application to the undisputed facts of this case.

Although I recognize that my task in this case is to construe the specific words of the policy issued by St. Paul to Bergquist, I note that the Supreme Court of Minnesota has quoted with approval Professor Roger

C. Henderson's explanation of the general purpose comprehensive general liability insurance coverage for damages arising out of the products or work of the insured:

"The risk intended to be insured is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the product or completed work itself, and for which the insured may be found liable. The insured, as a source of goods or services, may be liable as a matter of contract law to make good on products or work which is defective or otherwise unsuitable because it is lacking in some capacity. This may even extend to an obligation to completely replace or rebuild the deficient product or work. This liability, however, is not what the coverages in question are designed to protect against. The coverage is for tort liability for physical damage to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained." Henderson, Insurance Protection for Products Liability and Completed Operations—What Every Lawyer Should Know, 50 Neb. L. Rev. 415, 441 (1971) (quoted in *Bor-Son Building Corporation v. Employers Commercial Union Insurance Company of America,* 323 N.W.2d 58, 63 (Minn. 1982), and in *Knutson Construction Company v. St. Paul Fire and Marine Insurance Company,* 396 N.W.2d 229, 232 (Minn. 1986)).

VI. THE IMPAIRED PROPERTY EXCLUSION

The "impaired property" exclusion in the policy provides as follows:

"We won't cover property damage to impaired property, or property that hasn't been physically damaged,

that's caused by: your faulty or dangerous products or completed work. . . ." (CGL form, p. 10.)

Therefore there are two requirements for the impaired property exclusion to apply to Sunroc's claims. First, Sunroc's coolers must be considered "impaired property" within the meaning of the exclusion. And second, the Bergquist Q-Pad II heat transfer tape which emitted the offensive odor must be considered a "faulty product" within the meaning of the exclusion.

## A. *"Impaired Property"*

There is no doubt that the Sunroc coolers are "impaired property" within the meaning of the exclusion. Impaired property is defined as:

"tangible property, other than your products or completed work, that can only be restored to use by:

"the adjustment, repair, replacement or removal of your products or completed work which forms a part of it. . . ." (CGL form, p. 10.) Applying the policy definition to the instant facts, Sunroc coolers were "impaired property" because they were tangible property, other than Bergquist's products or completed work, that were only able to be restored to use by the replacement or removal of the Bergquist product (*i.e.* the Q-Pad II tape) that formed a part of the coolers.

## B. *"Faulty Product"*

Bergquist asserts that its Q-Pad II which emitted the offensive odor is not a "faulty product" within the meaning of the impaired property exclusion. St. Paul asserts that Bergquist is collaterally estopped from asserting that the Q-Pad II is not a "faulty product" by virtue of the award of the arbitrator in the arbitration. This court finds that St. Paul is correct.

Collateral estoppel operates "to prevent a question of law or issue of fact which has once been litigated and fully determined in a court of competent jurisdiction from being relitigated in a subsequent suit." *Incollingo v. Maurer,* 394 Pa. Super. 352, 356, 575 A.2d 939, 940 (1990). Under Pennsylvania law collateral estoppel applies if five requirements are satisfied:

"(1) the issue decided in the prior case is identical to one presented in the later case; (2) there was a final judgment on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party in the prior case; (4) the party or person privy to the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding and (5) the determination in the prior proceeding was essential to the judgment." *Incollingo, supra* at 356, 575 A.2d at 940 (quoting *City of Pittsburgh v. Zoning Board of Adjustment of Pittsburgh,* 522 Pa. 44, 55, 559 A.2d 896, 901 (1989)).

Bergquist argues that the award of the arbitrator in the arbitration did not necessarily determine that the Q-Pad II tape which emitted the offensive odor was a "faulty product." Although the issue of policy coverage was obviously not presented to the arbitrator, this court believes that the arbitrator's award clearly and necessarily was a determination that the product was "faulty."

At the arbitration, Bergquist maintained that the Q-Pad II had been misused by Sunroc when Sunroc subjected the product to higher temperatures than had been recommended by Bergquist. The arbitrator obviously rejected Bergquist's defense and awarded Sunroc $618,879.41 in damages against Bergquist consisting of $39,361.81 to rework certain coolers to remove the offending Q-Pad II tape and $579,517.60 for profits

which it lost due to planned purchases which were cancelled as a result of the Q-Pad II odor problem. Although the arbitrator did not issue any findings of fact or conclusions of law, in view of his award, this court cannot conceive of any basis upon which it can be fairly concluded that the arbitrator did not determine that the Q-Pad II tape was "faulty."

In an effort to avoid the estoppel effect of the arbitration, Bergquist argues that the arbitrator may have based its award on the theory that Bergquist was negligent in not advising Sunroc of the change in the adhesive it was using for the Q-Pad II tape, as opposed to finding that the product was defective or faulty. This argument fails for several reasons. First, no negligence claim was asserted by Sunroc in its demand for arbitration. Instead, in its demand for arbitration, Sunroc's claim against Bergquist was for "[b]reach of contract; breach of warranty" and Sunroc sought damages for "[r]eworking already manufactured product to replace defective goods." (Sunroc's demand for arbitration, St. Paul S.J., exhibit "E".) Neither party has submitted any evidence that Sunroc ever amended its demand for arbitration to include a negligence claim.[2] Accordingly, no distinct claim for negligence was within the scope of the arbitration. Second, I question whether any negligence claim could properly have been determined by the arbitrator since the arbitration clause which was the basis of the arbitration provided only

---

2. The American Arbitration Association's Commercial Arbitration Rules in effect when the arbitration was conducted provided that if after filing a claim in arbitration "either party desires to make any new or different claim . . ., same shall be made in writing and filed with the AAA . . . ." American Arbitration Association Commercial Arbitration Rules as amended and in effect January 1, 1991, Rule 8.

that "[a]ny controversy or claim arising out of or related to this contract, or the breach thereof, shall be settled by arbitration . . . ." (Sunroc's demand for arbitration, St. Paul S.J., exhibit "E".) Finally, even if the arbitrator concluded that the coolers had to be reworked and sales were lost because Bergquist negligently failed to warn Sunroc of the change in the adhesive, I find that the Q-Pad II tape would still be regarded as "faulty" for purposes of the policy. The impaired property exclusion does not distinguish between the various possible causes of the product being faulty—*i.e.,* between negligence and strict liability. Instead, the impaired property exclusion focuses only on whether the insured's product was faulty. Certainly our products liability law recognizes that a product which lacks proper warnings and instructions regarding its use is equally "defective" as a product with a physical design or manufacturing defect. See *e.g.,* Pa. Suggested Standard Jury Instructions (Civ.) §8.03

C. *The "Sudden and Accidental Damage" Exception to the "Impaired Property" Exclusion*

The policy provides an exception to the impaired property exclusion which I shall refer to as the "sudden and accidental damage exception." This exception provides as follows:

"But we won't apply this exclusion to damages that result from the loss of use of other property not physically damaged that's caused by sudden and accidental physical damage to your products or completed work after they've been put to their intended use. For example:

"You supply an electric motor to a customer who uses it to power his conveyor. The motor's shaft breaks several days later while he's operating the conveyor. The conveyor isn't damaged, but your customer has

extra costs because he's unable to use it until the motor is repaired. If he sues you to recover those costs, we won't apply the exclusion. However, if the customer discovers while hooking the motor up to the conveyors that the motor's shaft is broken, we won't protect you." (CGL form, p. 10.)

As might be expected, St. Paul argues that the sudden and accidental damage exception to the impaired property exclusion is inapplicable to Sunroc's claims and Bergquist argues that it is applicable. For at least two reasons, this court agrees with St. Paul that the exception is inapplicable to Sunroc's claims.

First, the sudden and accidental damage exception only applies to "damages that result from the loss of use of other property . . . after . . . [your products] have been put to their intended use"—*i.e.,* in this case, to damages that result from the loss of use of the coolers after the Q-Pad II had been put to its intended use of heating water in the coolers. However, the arbitrator did not award any damages to Sunroc for loss of use of its coolers. Instead, the arbitrator awarded $579,517.60 of damages for Sunroc's lost profits. These "lost profits" damages obviously did not relate to coolers where the Q-Pad II had been put to use; instead, these damages related to coolers that were never sold or used. Sunroc's claims for lost profits are directly analogous to the example set forth in the exception of the customer who discovers the broken motor shaft before hooking the motor up for use. Here, Sunroc discovered the faulty Q-Pad II tape—analogous to the broken motor shaft—before the coolers had been sold or used or the heat tape put to its intended use. Moreover, the $39,361.81 of damages which the arbitrator awarded for costs of reworking coolers to replace the Q-Pad II tape clearly are not damage claims for loss of use of the coolers.

Second, with respect to the damages awarded for Sunroc's lost profits for the cooler sales that Perrier cancelled, it cannot fairly be concluded that this claim relates to "sudden and accidental physical damage" to Q-Pad II tape. This claim relates to coolers that were never produced, or if produced were never used so as to subject the Q-Pad II tape to any damage.

## VII. THE PRODUCT RECALL EXCLUSION

The policy also contains an exclusion to the coverage otherwise provided which is referred to as the "product recall exclusion." This exclusion provides as follows:

*"Product recall.* We won't cover damages that result from the: . . .

"recall, withdrawal;

"adjustment, inspection, repair, replacement; or

"removal or disposal of;

"impaired property or your products or completed work from the market or from use by anyone for any reason." (CGL form, p. 10.)

In its decision in *Ohio Casualty Insurance Company v. Terrace Enterprises Inc.,* 260 N.W.2d 450 (Minn. 1977), the Minnesota Supreme Court was called upon to construe a product recall exclusion in a liability policy which was similar, but not identical, to the product recall exclusion which is at issue in this case. In *Ohio Casualty,* the court relied upon the Supreme Court of Texas' explanation of the purpose of such "product recall" exclusions:

"In *Gulf Ins. Co. v. Parker Products Inc.,* 498 S.W.2d 676, 678 (Tex. 1973), the court discussed the origin of the clause:

"We find no cases construing this relatively new policy provision, but it is discussed in 2 Long, Law of

154

Liability Insurance, App. at 15 (1966). The provision is there referred to as the 'sistership exclusion' and is explained as follows: 'It denies coverage for claims based upon the cost of withdrawing a product from the market, replacing a product or the loss of use of a product which is temporarily or permanently withdrawn from the market because of occurrences involving the same or a similar product. The name derives from an occurrence in the aircraft industry where all airplanes of a certain make and type were grounded by an order of the Civil Aeronautics Administration because one crashed and others were suspected of having a common structural defect. The damages arising out of the loss of use of all the sister ships were enormous.

"The recall of equipment or parts discovered to have a common fault involve expenses incurred to prevent accidents which have not occurred. While the insurance covers damages for bodily injuries and property damage caused by the product that failed, it was never intended that the insurer would be saddled with the cost of preventing other failures, any more than it was intended that the insurer would pay the cost of preventing the first failure if the product has been discovered to be in a dangerous condition before the occurrence." *Ohio Casualty, supra* at 455.

This court believes that the product recall exclusion is applicable to the damages which were awarded by the arbitrator to Sunroc. With respect to the $39,361.81 of damages awarded to Sunroc for reworking those coolers that contained the Q-Pad II tape that emitted the offensive odor, these damages clearly resulted from the "repair [or] replacement . . . of . . . impaired property [*i.e.,* the coolers][3] or your products [*i.e.,* the Q-Pad

---

3. The definition of "impaired property" is the same for the product recall exclusion as it is for the impaired property exclusion. See

II tape which gave off the foul odor] . . . for any reason." The indisputable basis for the arbitrator's award of $579,517.60 of damages to Sunroc for lost profits was that Perrier cancelled its planned purchases from Sunroc as a direct result of the odor problems with the Q-Pad II tape and Bergquist's recall of the malodorous tape. Accordingly, this court finds that these lost profits damages resulted from the "recall . . . [or] withdrawal . . . of . . . your products [*i.e.,* the Q-Pad II tape which gave off the foul odor] . . . from the market or from use by anyone for any reason."

## VIII. CONCLUSION

For the foregoing reasons, this court believes that it properly granted summary judgment in favor of St. Paul and that Bergquist's appeal is without merit.

---

section VI. A. of this opinion for a discussion of the definition of "impaired property."